# LOUISVILLE & JEFFERSONVILLE BRIDGE COM-PANY v. UNITED STATES

## CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 312. , Argued March 28, 1919.—Decided April 21, 1919.

The transferring of twenty-six cars as a unit, for delivery from the terminal of one company to that of another, without uncoupling or switching out any car, by a movement through a distance of over three-quarters of a mile, 2600 feet of it, with two startings and stoppings, on main tracks, at speed reaching fifteen miles per hour, and involving crossings at grade of several city streets, *held*, not a mere switching operation but a train movement, subject to the train-brake provisions of the Safety Appliance Act, as amended. P. 538.

The application of the act can not be made to depend on the taking of other than the prescribed precautions, such as providing gates and watchmen, or upon balancing the dangers involved in following its requirements against those involved in its neglect. P. 539.

THE case is stated in the opinion.

*Mr. Edward P. Humphrey,* with whom *Mr. Alex. P. Humphrey* and *Mr. W. W. Crawford* were on the brief, for Louisville & Jeffersonville Bridge Co.:

The cars mentioned in the certificate traveled, all told, a much less distance than those in *United States* v. *Chicago, Burlington & Quincy R. R. Co.,* 237 U. S. 410; *United States* v. *Pere Marquette R. R. Co.,* 211 Fed. Rep. 220; *United States* v. *Grand Trunk Ry. Co.,* 203 Fed. Rep. 775; *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 198 Fed. Rep. 637; *Chesapeake & Ohio Ry. Co.* v. *United States,* 226 Fed. Rep. 683; *Pennsylvania Co.* v. *United States,* 241 Fed. Rep. 828; and *United States* v. *Galveston, H. & H. R. R. Co.,* 255 Fed. Rep. 755. Furthermore, the

movement was not continuous or between two widely separated points, but distinctly local, in a circumscribed area used for switching purposes, the cars not making a train trip over the road in the ordinary acceptation of the term but going back and forth and over switches between points a very short distance apart.

A switching movement is none the less such because the cars pass partly over main track and partly over side track. In small yards, particularly in country districts, the main track is used extensively for switching purposes.

It is obvious that no good result can be accomplished by the continual coupling and uncoupling of air hose during switching movements, where the cars travel comparatively short distances, and the cuts are frequently broken up. Aside from the great expense in the operation of railroad yards, which would be entailed by enforcing such a requirement in this case, no good can result, as it would merely delay the handling of traffic and increase, rather than diminish, the danger which such legislation was intended to prevent.

*The Solicitor General,* with whom *Mr. Assistant Attorney General Frierson* was on the brief, for the United States.

MR. JUSTICE CLARKE delivered the opinion of the court.

The Circuit Court of Appeals for the Sixth Circuit certifies to this court for answer the question, whether the Safety Appliance Act, as amended, requires that 85 per cent. of the train brakes shall be coupled so as to be under engine control when making the transfer of twenty-six cars, in a movement which is described in the court's certificate.

The pertinent part of the original Act approved March 2, 1893, c. 196, 27 Stat. 531, reads:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system or, to *run any train in such traffic* . . . that has not a sufficient number of cars in it so equipped with power or train brakes *that the engineer on the locomotive drawing such train can control its speed* without requiring brakemen to use the common hand brake for that purpose."

And the relevant part of the amendment, approved March 2, 1903, c. 976, 32 Stat. 943, is:

"And the provisions and requirements hereof and of said Acts relating to train brakes . . . *shall be held to apply to all trains* . . . *used on any railroad engaged in interstate commerce.*"

Section 2 of the amendment provides that when any train is operated with power or train brakes not less than 50 per cent. of the cars in such train shall have their brakes used and operated by the engineer of the loco- motive, etc. Authority was given the Interstate Com- merce Commission to increase the percentage of cars in any train which must have their brakes so used and oper- ated and in 1910 the Commission increased it to 85 per cent.

The essential facts, somewhat condensed, from the statement of the Circuit Court of Appeals are:

The Bridge Company, a common carrier engaged in interstate commerce, operates a large terminal yard at Louisville, Kentucky, which constitutes the joint terminal of the Big Four and the Chesapeake & Ohio systems of railway. The yard is 1800 feet in length, 700 feet in width, and consists of two main tracks, with from fifteen to twenty-five approximately parallel tracks, which are connected with the main tracks by leads in the customary manner.

For the purposes of this proceeding the following movement of cars was adopted by the parties as typical. Twenty-six cars were assembled at the easterly end of the yard of the Bridge Company and were coupled together, but without any of the air brakes being connected, preparatory to their transfer westerly and delivery into the Illinois Central yard. The engine was at the easterly end of the cars, nearly 1100 feet in length, which were pushed westerly the entire length of the large and necessarily busy yard. Part of this movement in the Bridge Company's yard, how much does not appear, was over a main line track, it was necessarily over many connections with other tracks on which several other engines and crews must have been working, habitually, and it was over four city streets at grade, the crossing over the most westerly one, on account of the grade beyond, being made at a speed of 15 miles an hour. A short distance from the exit from the Bridge Company's yard the cars entered upon a track of the Illinois Central Railroad Company, used as a main line by both the Big Four and the Chesapeake & Ohio companies, and after they had been pushed westerly on that track a distance of 1100 feet, they were stopped on this main track. Next, reversing the movement, the engine, now pulling the cars, moved easterly over three city streets at grade a distance of 1300 feet on a track used by the Chesapeake & Ohio Company for its through main line trains, and stopped on that track. Again reversing, the engine, now pushing the cars, ran westerly over three city streets at grade a distance of 1300 feet, still on the track used as a through main line track by the Chesapeake & Ohio Company, and then into the Illinois Central yard, where the cars were delivered.

The contention of the Bridge Company is that the foregoing describes a mere switching of cars, not a train movement within the meaning of the act of Congress, and

that, therefore, the requirement that 85 per cent. of the cars shall have the train brakes upon them used and operated does not apply.

An engine and twenty-six cars, assembled and coupled together, not only satisfies the dictionary definition of a "train of cars," but would certainly be so designated by men in general and in any fair acceptation of the term must be regarded as constituting a train within the meaning of the statute. It was a train greater in length than most regularly scheduled trains were when this Safety Appliance Act was passed twenty-six years ago, and even yet, probably, exceeds in length, passenger and freight trains considered, more than a majority of the regular road trains in this country.

The work done with the cars, as described, was not a sorting, or selecting, or classifying of them, involving coupling and uncoupling, and the movement of one or a few at a time for short distances, but was a transfer of the twenty-six cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot, therefore, with propriety be called a switching movement.

The movement of this train of cars, 1100 feet in length, was for a distance of over three-quarters of a mile, and involved crossing, at grade, three city streets once, two streets twice, one street three times, and a main track movement of at least 2600 feet, with two stops and startings on the main track. This is not only a train movement, but it would be difficult to imagine one in which the control of the cars by train brakes would be more necessary, in order to secure that safety of employees, of passengers and of the public which it is the purpose of the act to secure, by requiring that engineers shall be given control sufficient to stop any train they may be moving, promptly on the first signal or sight of danger. The mere inertia of twenty-six cars, which must usually be

loaded, and especially when running 15 miles an hour, would render it impossible to control or to stop them promptly with power-brakes operative only on the engine, and the ability to use such brakes on the entire train must often mean the difference between safety and serious accident when running, as here, in a crowded yard, across busy city streets and on main line tracks of railroads.

It is argued that coupling of the train brakes was not necessary for the reason that the street crossings used were protected by gates, that a yard master from an elevated tower watched over the main line movements, and that the coupling of the train-brake appliances would involve more danger to the employees than the movement of the cars without their being used and operated. These suggestions serve to emphasize the dangerous character of the movement. But the construction which the act should receive is not to be found in balancing the dangers which would result from obeying the law with those which would result from violating it, nor in considering what other precautions will equal, in the promotion of safety, those prescribed by the act. Such considerations were for Congress when enacting the law and it has repeatedly been held by this court that other provisions of the Safety Appliance Act impose upon the carrier the absolute duty of compliance in cases to which they apply and that failure to comply will not be excused by carefulness to avoid the danger which the appliances prescribed were intended to guard against, nor by the adoption of what might be considered equivalents of the requirements of the act. *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Taylor*, 210 U. S. 281, 295; *Great Northern Ry. Co.* v. *Otos*, 239 U. S. 349; *St. Joseph & Grand Island Ry. Co.* v. *Moore*, 243 U. S. 311.

The case falls within the scope of *United States* v. *Erie R. R. Co.*, 237 U. S. 402, and *United States* v. *Chicago, Burlington & Quincy R. R. Co.*, 237 U. S. 410, 413, in

the latter of which it is said that "the controlling test of the statute's application lies in the essential nature of the work done."

For the reasons stated in this opinion, the movement as described in the certificate and the essential nature of the work done, require that the question of the Circuit Court of Appeals be answered in the affirmative.