# CHICAGO & E. R. CO. v. UNITED STATES.

Circuit Court of Appeals, Seventh Circuit.
December 12, 1927.

No. 3913.

**Railroads ⬯229(3)—Movement of engine and 28 cars from yard onto main track and into another yard was "train movement," within Safety Appliance Act, § 2 (45 USCA § 9).**

Where train in question came to yard and after train had broken up and cars were distributed, 28 cars remained for movement to and further switching in another yard or section, and engine and 28 cars moved onto main track for distance of 1,500 feet, and then entered the other yard, or section of yard, and moved distance of 2,850 feet, no stops being made for purpose of switching, movement was "train movement," within meaning of Safety Appliance Act, § 2 (45 USCA § 9 [Comp. St. § 8614]).

In Error to the District Court of the United States for the District of Indiana.

The Chicago & Erie Railroad Company brings error. Affirmed.

John E. Gavin, of Chicago, Ill. (Mitchell D. Follansbee and Clyde E. Shorey, both of Chicago, Ill., on the brief), for plaintiff in error.

James S. Hawley, for defendant in error.

Before EVANS, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. The question raised is: Was the handling in question of its freight cars by the Erie Railroad, at Huntington, Ind., a switching operation, or was it a "train movement," within the meaning of section 2 of the Safety Appliance Act of March 2, 1903 (32 Stat. p. 943 [45 USCA § 9; Comp. St. § 8614])?

We are in serious doubt as to whether the record presents anything for review, but that question has not been raised by the parties. What are switching operations, and what are train movements, within the meaning of the Safety Appliance statutes, has many times been presented to the courts.

The Supreme Court has said that: "A

train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road." U. S. v. Erie R. R., 237 U. S. 402, 407, 35 S. Ct. 621, 624 (59 L. Ed. 1019). In the same case the court gave a general definition of what constitutes switching operations, and it was held that the acts there in question were train movements within the statute.

We find very little to distinguish that case from this one. In that case and in United States v. Chicago, Burlington & Quincy R. Co., 237 U. S. 410, 35 S. Ct. 634, 59 L. Ed. 1023, very many conditions and elements were considered which seem to influence the determination of the question. In the Burlington Case, there were no fixed schedules, and the movements were not controlled by train dispatchers, but by block signals. It was there held that the absence of a caboose or markings did not make the engine and connected cars any less a train, nor did the fact that the men in charge were designated as yard or switching crews make it any the less a train movement.

In Louisville & Jeffersonville Bridge Co. v. United States, 249 U. S. 534, 539, 39 S. Ct. 355, 357 (63 L. Ed. 757), the court said: "But the construction which the act should receive is not to be found in balancing the dangers which would result from obeying the law with those which would result from violating it, nor in considering what other precautions will equal, in the promotion of safety, those prescribed by the act. Such considerations were for Congress when enacting the law and it has repeatedly been held by this court that other provisions of the Safety Appliance Act impose upon the carrier the absolute duty of compliance in cases to which they apply and that failure to comply will not be excused by carefulness to avoid the danger which the appliances prescribed were intended to guard against, nor by the adoption of what might be considered equivalents of the requirements of the act."

In United States v. Northern Pac. Ry. Co., 254 U. S. 251, 254, 41 S. Ct. 101, 102 (65 L. Ed. 249), it was said: "A moving locomotive with cars attached is without the provision of the act only when it is *not* a train, as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains."

The whole question was considered at length, and many authorities cited, in Illinois Central R. Co. v. United States, 14 F. (2d)

747 (C. C. A. 8th Cir.). Possibly no exact rule can be laid down by which it can, in all cases, be determined whether there is a train movement or a mere switching operation. In this case, whether the three sections constituted one yard or three yards, we think, is immaterial. We have here these facts:

After the west-bound train in question came to section B of the Huntington yard, and the train had been broken up and distribution of cars made, pursuant to instructions, 28 cars remained in section B of said yard for movement to and further switching in section C. The switch engine was attached to the 28 cars and "moved from the north (or west) end of section B of the defendant's yard out onto its west-bound main track, used by its through freight and passenger trains, and northward (or westward) along said main track for a distance of 1,500 feet, at which point it entered section C of defendant's yard and continued northward (or westward) over its switching lead and No. 10 track, a distance of approximately 2,850 feet."

That west-bound track was "the only track connecting section B with section C of the Huntington yards. * * * The air hose between the tender of the locomotive and the first car were not coupled. * * * No stops were made for the purpose of setting out, picking up or otherwise switching the cars. * * * After the train * * * arrived at the point in section C of said yard designated as F on Exhibit 3, the crew proceeded, without delay, to classify and deliver the 28 cars on the various tracks of section C."

In addition to a number of freight and passenger trains "there are from 35 to 40 movements of engines and cabooses, pusher engines or engines with cars attached each 24 hours, in both directions, on the west-bound track," over which the movements in question were made. There were numerous street crossings and a railroad crossing at grade, over which numerous trains passed daily. An engine and 28 cars would make a train approximately 1,000 feet long.

In so far as they may be considered as influential in determining the case, we are of opinion that there were present all of the elements of danger against which Congress intended to protect employees and the persons and property of the public by providing an adequate means for controlling train operations. The time necessary to couple or uncouple cars, as well as many other elements discussed in this case, must not influence the construction of the statute by the courts un-

less and until Congress shall make obedience to the law conditional and not absolute.

We think there is shown a "train movement," within the meaning of the statute, and that the judgment should be, and it is, affirmed.