**UNITED STATES v. SOUTHERN PACIFIC CO.**

No. 18910.

District Court, N. D. California, S. D.

Nov. 27, 1931.

George J. Hatfield, U. S. Atty., and Lucas E. Kilkenny, Asst. U. S. Atty., both of San Francisco, Cal.

Henly C. Booth and A. G. Goodrich, both of San Francisco, Cal., for defendant.

NORCROSS, District Judge.

This is an action under the Safety Appliance Acts, 45 USCA § 1 et seq. The complaint alleges five causes of action based on five transfer movements of cars made during September, 1930, between the Mission Bay unit and the Sixth street unit of defendant's yard in San Francisco. The movements consisted of 10, 26, 20, 8, and 13 cars, respectively, and in each instance the air brakes were not under the control of the enginemen, due to the air hose being disconnected.

The Mission Bay unit and the Sixth street unit are within an area less than 4,000 feet square. The two units are connected by a line of track paralleling Seventh street on the southwest side of defendant's yard for a distance of approximately 2,500 feet, the total length of the line being approximately 4,000 feet between the terminal points where it connects with the assemblage of switching and classification tracks of the respective units.

The line in question does not directly connect with the main line of defendant which parallels it along Seventh street. With the exception of six yard switch connections along Seventh street, it does not cross any other track of defendant or that of any other railroad. Between the two units the track crosses eight public streets at grade, the majority of which are protected by crossing watchmen during daylight hours. Upon none of the streets so crossed are street car lines.

In none of the movements complained of were any cars picked up or set out en route, and in each instance the assemblages of cars moved as a unit; the switching necessary to make up or break up these transfer movements being done before the transfer started on its journey or after arrival at destination. These movements were wholly within yard limits, and were made by yard engines and yard crews, and under the direction of the yardmaster. Two of the five movements were made by the locomotives pushing the cars.

The question of law presented is whether the movements of cars as above described were train movements within the meaning of the statute, or mere switching movements.

In support of plaintiff's contention that these were train movements, the following cases are cited: United States v. Erie R. R. Co., 237 U. S. 402, 35 S. Ct. 621, 624, 59 L. Ed. 1019; United States v. Chicago, B. & Q. R. R. Co., 237 U. S. 410, 35 S. Ct. 634, 635, 59 L. Ed. 1023; Louisville & Jeffersonville Bridge Co. v. United States, 249 U. S. 534, 39 S. Ct. 355, 356, 63 L. Ed. 757; United States v. Northern Pacific Ry. Co., 254 U. S. 251, 41 S. Ct. 101, 102, 65 L. Ed. 249; Great Northern Ry. v. United States (C. C. A.) 288 F. 190, 191; Illinois Cent. R. Co. v. United States (C. C. A.) 14 F.(2d) 747, 748; Chicago, St. P., M. & O. Ry. Co. v. United States (C. C. A.) 36 F. (2d) 670.

In the Erie Case cited the "transfer trains" under consideration moved from Jersey City and Weehawken to Bergen, and vice versa. "They were made up in yards like oth-

er trains, and then proceeded to their destinations over main-line tracks used by other freight trains, both through and local. They were not moving cars about in a yard or on tracks set apart for switching operations, but were engaged in main-line transportation * * * over switches leading to other tracks, and across passenger tracks whereon trains were frequently moving."

In the Chicago, Burlington & Quincy Case there was presented the question of movements of cars at Kansas City between two freight yards "on opposite sides of the Missouri river, the distance between their nearest points being about 2 miles. The track connecting them is one by which passenger and freight trains enter and leave the city; in other words, a main-line track. For a distance of 3,000 feet it is upon a single-track bridge spanning the river, and off the bridge it intersects * * * and passes through the Union Depot tracks. Besides its use by the defendant's trains, a considerable portion of it is also the line by which the passenger trains and some of the freight trains of the Rock Island and Wabash railroads enter and leave the city."

In the Louisville & J. Bridge Co. Case the cars were assembled in the yard of the Bridge Company "preparatory to their transfer westerly and delivery into the Illinois Central yard. * * * The cars entered upon a track of the Illinois Central Railroad Company, used as a main line by both the Big Four and the Chesapeake & Ohio Companies. * * *"

In the Northern Pacific Case the cars were moved upon a line used by two independent companies "for freight trains under air control and that the passenger trains of another company cross it."

In the Great Northern Case the twenty-four cars there involved "were pushed by an engine from this point ["P" yard] to a point west of Lyndale avenue bridge known as the 'Hay' yard north of the main tracks. To reach this place they moved east from the 'P' yard, crossed the east line main track to the west line main track, and proceeded east on this track to the lead at the 'Hay' yard, where the cars were distributed to certain industries and delivery tracks."

In the Illinois Central Case the track in question, in addition to crossing certain streets at grade, crossed "some switch tracks of the Chicago & St. Paul Railroad at Fourteenth street, and the Missouri Pacific tracks at California street; also that a portion of

this track * * * was jointly used by defendant and the former road."

The Chicago, St. Paul, M. & O. Ry. Co. Case involved the movement of sixteen cars as a unit by a locomotive used for switching purposes from the south part of its yards in Omaha north, a distance of one and one-fourth miles to where the railroad's freight trains were commonly made up. "Four city streets used by the public were crossed, and two tracks of other railroads, not used for main line traffic, were crossed. The track over which the movement was made was a lead from the interchange track, on which the cars were assembled, to the north yard." During the movement in question "one stop was made at a railroad crossing."

The Chicago, St. Paul, etc., Co. Case, last referred to, upon the facts is more nearly like the case at bar than any of the others cited. In that case, however, there is the important distinction that two tracks of other railroads were crossed and one stop required to be made before making such crossing.

Commenting on the facts involved in the Erie Case, the Supreme Court said: "They were made up in yards like other trains, and then proceeded to their destinations over main-line tracks used by other freight trains, both through and local. They were not moving cars about in a yard or on tracks set apart for switching operations. * * *"

In the case at bar, the movements were within a single yard between two units thereof and on a track having no connection with any but switching tracks. They were upon a track in fact set apart for switching operations.

In the Louisville & J. Bridge Co. Case the court said: "The work done with the cars, as described, was not a sorting, or selecting, or classifying of them, involving coupling and uncoupling and the movement of one or a few at a time for short distances, but was a transfer of the 26 cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot therefore with propriety be called a switching movement."

While in the case at bar the movement of cars between the two units of the yard was a transfer of the cars as a unit, such transfer was not "from one terminal into that of another company for delivery," and, also, did not involve "a main line track movement."

It is important to note that in the last-mentioned case the court further said: "This

is not only a train movement, but it would be difficult to imagine one in which the control of the cars by train brakes would be more necessary, in order to secure that safety of employees, of passengers and of the public which it is the purpose of the act to secure. * * * "

In the Northern Pacific Co. Case the Supreme Court said: "A moving locomotive with cars attached is without the provision of the act only when it is not a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains."

From this it does not necessarily follow that a movement of cars as in the case at bar is a train within the meaning of the statute, where such movement is on a line which has no other connections except with switching tracks, and which line in purpose and reality is but an extension of such switching tracks.

In the Great Northern Case the court said: "The mere fact that the railroad company designates a large stretch or tract as yard does not make every operation therein a switching operation. If so, the act could be avoided by including large areas in the term yard."

The two portions of the yard designated units in the case at bar present quite a different situation than is presented in the Great Northern Case. The question whether it be a train or a switching movement must be determined by the peculiar facts of each case. If the entire movement is within a designated yard, that is a fact to be considered with other pertinent facts. As said in the Illinois Central Case: "The decisions turn upon the particular facts of each case. All of them contain many varying and conflicting factors, no one of which alone is controlling."

The opinion of the Supreme Court in the Chicago, Burlington & Quincy Case is illuminating. From it we quote the following: "The work in which they were engaged was not shifting cars about in a yard or on isolated tracks devoted to switching operations, but moving traffic over a considerable stretch of main-line track,—one that was a busy thoroughfare for interstate passenger and freight traffic. Every condition suggested by the letter and spirit of the air-brake provision was present. And not only were these trains exposed to the hazards which that provision was intended to avoid or minimize, but unless their engineers were able readily and quickly to check or control their movements they were a serious menace to the safety of other trains which the statute was equally designed to protect. * * * Neither is it material that the men in charge were designated as yard or switching crews, for the controlling test of the statute's application lies in the essential nature of the work done rather than in the names applied to those engaged in it."

As said by the Circuit Court of Appeals of this circuit in Hill v. Carter (C. C. A.) 47 F.(2d) 869, 871: "In considering * * * the extent that any decision may be considered as controlling or an authority upon a particular question presented for determination in an instant case, it is well always to have in view the maxim never better expressed than in the language of Chief Justice Marshall in the celebrated case of Cohens v. Virginia, 6 Wheat. 399, 5 L. Ed. 257: 'It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. * * * ' "

The conclusion reached upon the facts presented in the case at bar is that "the essential nature" of the movements in question was switching, and not train movements.

Judgment for defendant.