## UNITED STATES v. SOUTH BUFFALO R. CO.

### No. 166, Docket No. 20860.

Circuit Court of Appeals, Second Circuit.
June 30, 1948.

T. Vincent Quinn, Asst. Atty. Gen.,
George L. Grobe, U. S. Atty., of Buffalo,
N. Y., Leo Meltzer, Atty., Department of
Justice, of Washington, D. C. (Henry J.
Vinskey, Attorney, Interstate Commerce
Commission, of Washington, D. C., of coun-
sel), for the United States.

Cravath, Swaine & Moore, of New York
City (Hoyt A. Moore; Bruce .Bromley
and Frank M. McGarry, all of New York
City, of counsel), for South Buffalo Ry. Co.

Before SWAN, AUGUSTUS N. HAND
and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an action brought by the United States against South Buffalo Railway Company to collect a penalty for violating the Safety Appliance Act, 45 U.S.C.A. §§ 1–16 inclusive. The third and sixth claims asserted against the defendant, which are alone in question on this appeal, involve the Safety Appliance Act, §§ 1 to 10, and an order of the Interstate Commerce Commission dated June 6, 1910, which prescribe that a minimum percentage of power air brakes shall be used in a train. Section 9 of Title 45 of the Code requires that not less than 50 per cent of the cars in a train shall have their brakes used and operated by the engineer of the locomotive drawing such train and the order of June 6, 1910, increased that percentage to 85 per cent.

The third cause of action relates to the movement of 15 cars, moving from Buffalo, New York, to Lackawanna, New York, only 10 of which had their brakes used and operated by the engineer of the locomotive.

The sixth cause of action relates to a movement by the same locomotive. The movement there was of 15 cars in the reverse direction from Lackawanna to Buffalo, none of which had their brakes hooked up.

It is undisputed that the statute does not apply to a switching movement. The plaintiff argues that it covers the facts of the case at bar for the reason that the proof and findings of the court below show that the movements in question were train movements and not switching movements.

The defendant is situated and operates entirely within a strip of land less than 6 miles in length and 3 miles in width. It owns and operates approximately 87 miles of track. Its entire system of trackage is operated as a single yard. All of its crews are yard crews and they are paid at yard rates applicable to yard switching services. Through trains do not pass over its tracks. It does not have any block signal system and all of its movements are made at slow speeds with a member of the crew stationed at the forward end of the locomotive so that he can see sufficiently far ahead to enable the movement to be brought to a stop within one-half of the range of his vision. All of its operating income and expenses is at the express direction of the Interstate Commerce Commission, classified as switching income and expenses. Findings 14, 15, 16 and 17 describe the movements upon which our discussion whether they are train or switching movements must depend and are set forth in the margin.[1]

---

[1] "14. The movement performed by South Buffalo which is referred to in the third cause of action of the complaint herein was made on December 4, 1944, by a switching locomotive and 15 cars from tracks adjacent to the plant of Buffalo Sintering Company to a point commonly referred to as the North Yard, a distance of slightly less than 2 miles. Said locomotive was equipped with power-driven wheel brakes and appliances for operating a train brake system. Less than 85% of such cars had air brakes used and operated by the locomotive engineer. Said movement was made at an average speed of approximately 5 miles an hour; no public streets, highways or tracks of other railroads were travelled upon or crossed at grade and visibility along the entire route was unobstructed.

"15. The movement described in the preceding finding numbered 14 was a part of a switching movement made of those 15 cars, for which South Buffalo was paid one switching charge per car.

Such 15 cars were assembled by South Buffalo from various points in the plant of Buffalo Sintering Company and moved slightly less than two miles to a point commonly referred to as the North Yard where 5 of them were cut out and set off on a track known as N-1. The remaining 10 cars were then switched southward a distance of approximately a quarter of a mile to the so-called Junction E area of South Buffalo where one car destined for delivery to The New York, Chicago and St. Louis Railroad Company was switched out and set off on a track known as the "M". Thereafter 4 of the remaining 9 cars, which were destined for delivery to The Pennsylvania Railroad Company, were switched to and set off on a track known as So-3. The remaining 5 cars, which were destined for delivery to New York Central Railroad Company were then switched to another track known as So-2.

"The 5 cars which had been set off first were later switched to various destinations as follows: two of the cars

950

It appears from the foregoing findings and the opinion of the court that the movements were both ones where 15 cars, which had been gathered together by various switching movements, were transported as a unit at an average speed of five miles per hour for a distance of approximately two miles to points where they were then broken up and switched to various tracks for further shipment or for unloading. In both instances the 15 cars passed no crossings except a private one of the Bethlehem Steel Company. This crossing was protected by a guard and was used by em-

ployees and business visitors of that company but there was uncontradicted evidence that a considerable number of people crossed the tracks there, particularly at the beginning of the morning and at the end of the day when the plant closed. There is further evidence by an inspector of safety appliances for the Interstate Commerce Commission, who had had thirty-two years railroad experience, that there was grave danger in moving these cuts of cars over the grades involved in the movements without having the air brakes hooked up. The district judge determined that upon the

were switched to a track known as 3 North of 2 Open Hearth Plant and from there they were again switched to a track in 2 Open Hearth Plant; three of the cars were switched to other points for loading. The remaining 10 cars were switched as follows: One car was switched back, together with other cars, past the plant of Buffalo Sintering Company to South Buffalo's Junction C and was ultimately delivered to The New York, Chicago and St. Louis Railroad Company; the 5 cars which had been shunted into So-2 for delivery to The New York Central Railroad became part of a cut of cars being built up from various points on South Buffalo for delivery to The New York Central Railroad and other line-haul carriers for road movements; the 4 cars which had been shunted into So-3 for delivery to The Pennsylvania Railroad Company likewise became part of a cut of cars being built up from many points on South Buffalo for delivery to The Pennsylvania Railroad Company and other line-haul carriers for road movements to points served by those carriers.

"16. The movement performed by South Buffalo which is referred to in the sixth cause of action of the complaint herein was made on December 5, 1944, by a switching locomotive and 15 cars from a point opposite the guard's building at Gate No. 3 of Bethlehem Steel Company to tracks adjacent to the plant of the Buffalo Sintering Company, a distance of approximately 2 miles. Said locomotive was equipped with power driven wheel brakes and appliances for operating a train brake system. None of the cars had air brakes used and operated by the locomotive engineer. Said movement was made at an average speed of 5 miles per hour; no public streets, highways or tracks of other railroads were travelled upon or crossed at grade and visibility along the entire route

was unobstructed. The only crossing at grade was one private industrial crossing owned by the Bethlehem Steel Company, the use of which is restricted to Bethlehem Steel Company employees and those to whom permission is given by such Company to pass in and out of its property; and such crossing is adequately protected.

"17. The movement described in the preceding finding numbered 16 was a part of a switching movement made by those 15 cars for which South Buffalo was paid one switching charge per car. The 15 cars began their movements from five separate points; 4 of them originated at three separate blast furnace plants of Bethlehem Steel Company; 6 of them originated at the Ore Screening Plant of Bethlehem Steel Company; the remaining 5 cars originated at an ore stock pile of that Company. From those points of origin they were, through various switching movements, switched into two groups of 10 and 5 cars respectively. The group of 10 cars was switched a distance of approximately one-quarter of a mile where the movement stopped to switch the group of 5 cars into the string. The string of 15 cars was then switched to a point described as Gate 4, where it stopped and from which it subsequently moved a distance of approximately 500 feet to a point near Gate 3, where it again stopped. From that point, which is the point at which the movement referred to in the preceding finding numbered 16 began, the cars were switched approximately 2 miles to the plant of Buffalo Sintering Company where they were switched and set off on various tracks at that plant. Before being placed for unloading they were switched to a track scale and weighed. After weighing, they were switched to various tracks for unloading."

facts before him there was no necessity for the application of the safety requirements of the Act. This conclusion was apparently because he conceived of all of the car movements within the tract owned by the defendant as in effect switching movements involving no sufficient hazard to justify the requirement of air brakes.

This is a close case and the opinion and findings of Judge Knight who conducted the trial show a careful scrutiny, but after much deliberation and not without some doubt we feel obliged to differ with his conclusion that the defendant was not subject to the Safety Appliance Act in respect to the movements of the cars involved in the third and sixth causes of action. We agree with the judge in holding that the classification by the Commission of the defendant's operations as "switching" for accounting purposes should have little, if any, weight in determining whether the movements in question were "train movements" and indeed such a classification would seem to be counterbalanced by the Commission's request to the Attorney General to institute this action to enforce the penalties of the Act in respect to the transactions embraced in the third and sixth claims.

The requirements of the Act and the Commission's order apply to any "train," a term which has been interpreted to mean a train movement as contrasted with a switching movement. Apparently the reason why the Act has not been applied to situations characterized as switching is that they do not ordinarily fall within the meaning of the word "train" and involve a frequent coupling and uncoupling of cars within very limited areas which has been thought to render the use of air brakes impracticable and unnecessary to achieve the purposes of the Act. See opinion of Hutcheson, J., in United States v. Texas & N. O. R. Co., D.C.S.D.Tex., 13 F.2d 429, 430.

In the present case 15 cars which had been assembled at one point were moved as a unit for about two miles to another point where they were to be broken up for further disposition, without any cars being added or cut off over the route. We believe that this is a transfer of cars from one switching point to another and itself is a train movement within the normal meaning of the provisions of the Act rather than a switching operation. In a decision in United States v. Northern Pac. Ry. Co., 254 U.S. 251, 41 S.Ct. 101, 102, 65 L.Ed. 249, which held the Act applicable to a terminal railroad four miles in length which was not a main line, Mr. Justice Brandeis speaking for a unanimous court said: "A moving locomotive with cars attached is without the provision of the act only when it is *not* a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains." In an earlier decision in Louisville etc. Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 356, 63 L.Ed., 757, applying the Act to the transfer of cars from the terminal of one company to that of another three-quarters of a mile distant, Mr. Justice Clarke, also speaking for a unanimous court, said in elaboration of the factual differences between a train and a switching movement:

"An engine and 26 cars assembled and coupled together, not only satisfies the dictionary definition of a 'train of cars,' but would certainly be so designated by men in general, and in any fair acceptation of the term must be regarded as constituting a train within the meaning of the statute. * * *

"The work done with the cars, as described, was not a sorting, or selecting, or classifying of them, involving coupling and uncoupling and the movement of one or a few at a time for short distances, but was a transfer of the 26 cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot, therefore, with propriety be called a switching movement."

Other cases holding the Act applicable to short-run transfers of cars as a unit are United States v. Southern Pac. Co., 9 Cir., 100 F.2d 984, certiorari denied, 307 U.S. 633, 59 S.Ct. 836, 83 L.Ed. 1515, and United States v. Northern Pac. Ry. Co., D.C., D. Minn., 72 F.Supp. 528 containing a careful analysis of the principles involved and pertinent authorities.

952

The appellee especially relies upon the decision of the Seventh Circuit in United States v. New York, C. & St. L. Ry. Co., 7 Cir., 77 F.2d 215, and that of the Ninth Circuit in United States v. Great Northern Ry. Co., 9 Cir., 73 F.2d 736. We cannot reconcile the first of these with the opinions of the Supreme Court we have mentioned. The case in the Ninth Circuit may be distinguished for the reason that a consideration of all the movements involved may show that they were essentially switching operations requiring the classification and assembling of cars to make up a train which were continued to some extent at least throughout the entire period. In any event, some doubt may be cast upon that decision by the holding of the same circuit in the later case of United States v. Southern Pac. Co., 9 Cir., 100 F.2d 984, so that we cannot regard the earlier decision as a persuasive authority for the case at bar.

■ It is true that the decisions we have relied upon involved not only the transfer of cars as a single unit but also certain accompanying hazards on the route, which were somewhat different from and perhaps greater than those in the case at bar. We can see no essential difference however between a public crossing and the private way in the present case; indeed, a public crossing might have less traffic than the private one which intersected defendant's line. If the crossing here had been that of another railroad or of a public thoroughfare, we believe that under the authorities the defendant would not be exempt from the Safety Appliance Act. Nor is it reasonable to say that the existence of more than one crossing is necessary in order to create sufficient hazards to render the Act applicable. We think it undesirable for the courts by their decisions to enable railroads to eliminate safety appliances where hazards undoubtedly exist to some substantial degree and where the use of such appliance would insure increased protection. In the record before us there was testimony by an experienced interstate commerce inspector that the crossing and the existing grade at that point rendered the absence of air brakes dangerous. We can discover nothing in the testimony to justify a contrary conclusion unless it be the slow speed of the freight cars which were found to run at an average of five miles an hour; but there might be a higher speed on particular occasions. Moreover, we find no direct evidence to show that hand brakes on a train of 15 cars would insure the degree of safety required by the statute. The trial judge thought that a lookout at the forward end of the locomotive, who could see sufficiently far ahead to enable the movement to be brought to a stop within half the range of his vision, was an adequate protection. But we are not informed what this distance was, nor given any persuasive reason why a lookout was an adequate protection to justify dispensing with the safeguards of the Safety Appliance Act which ordinarily applies to movements of trains which we believe were shown to have existed here.

For the foregoing reasons, the judgment is reversed.