**UNITED STATES v. ELGIN, J. & E. RY. CO.**

No. 10009.

United States Court of Appeals
Seventh Circuit.

May 31, 1950.

James E. Keating, Asst. U. S. Atty., South Bend, Ind., Walter J. Keckich, Asst. U. S. Atty., Hammond, Ind., Leo Meltzer, Department of Justice, Washington, D. C., James M. McInerney, Asst. Atty. Gen., Gilmore S. Haynie, U. S. Atty., Fort Wayne, Ind. (Henry J. Vinskey, Atty., Interstate Commerce Commission, Washington, D. C., of counsel), for appellant.

R. C. Stevenson, Chicago, Ill., Glenn D. Peters, Hammond, Ind., Walker A. Jensen, Chicago, Ill. (Knapp, Cushing, Hershberger & Stevenson, Chicago, Ill., Peters & Highland, Hammond, Ind., of counsel), for appellee.

Before KERNER, FINNEGAN, and SWAIM, Circuit Judges.

KERNER, Circuit Judge.

The United States brought a civil action in six counts charging as many violations of the Safety Appliance Act, 45 U.S.C.A. §§ 1 to 16, and an order of the Interstate Commerce Commission promulgated pursuant thereto. Defendant admitted liability as to one of the counts; the court heard evidence as to the other five, rendered findings of fact and conclusions of law in favor of defendant, and entered judgment for defendant accordingly. The appeal from that judgment raises the question whether the movement of the five cuts of freight cars involved constituted "train movements" subject to the requirements of § 9 of the Act, or were merely "switching

movements" to which the section did not apply.

Section 9 of the Act provided that whenever, as provided in §§ 1 to 7, any *train* was operated with power or train brakes, not less than 50% of the cars in such train must have brakes used and operated by the engineer of the locomotive drawing such train, and provided for the increase of this minimum percentage by order of the I.C.C. Such order was duly issued in June.1910, increasing the percentage to 85%.

There is little dispute as to the facts. The five transfers here involved all took place within the Gary Terminal Yard which lies at the end of defendant's main line tracks in Gary, Indiana. Within this yard defendant maintains very extensive facilities in continuous use 24 hours a day every day of the year for servicing two large industrial plants. The yard contains over 300 miles of trackage and has a number of subdivisions all designated by names or letters and all interconnected. There are no public highways within the area and no tracks of any other railroad; four entrances from the business and residential portions of the city to the industrial plants are through viaducts under the tracks; the tracks over which the contested movements were made are not intersected at grade by any street, highway or public crossing. There are, however, two private crossings at grade within the area, one over each of two lead tracks used in the movements here involved. There was no evidence that either constituted or was likely to constitute a hazard; on the contrary, the evidence was that during the 35-year period since 1913 for which records were available there had never been an accident or injury to any employee or other person resulting from the operations of the type here involved, and the court so found.

The first cause of action involved the transfer of a cut of 84 freight cars from A yard to Kirk yard over a single-line connecting track for a distance of 2.1 miles during which no cars were picked up or set out and without power or air brakes in use on any of the cars. The other four causes of action involved similar transfers of cuts of cars for varying distances from other subdivisions under similar circumstances, all toward Kirk yard. According to the evidence of defendant's general superintendent, for all movements in the opposite direction, from Kirk yard, air brakes were connected and used.

The court found that the speed of the movements was approximately 4 or 5 miles an hour and that such speed was not in excess of the speed at which movements of such cuts of cars over the tracks could be checked and controlled quickly by the engineer using the locomotive brakes. It further found that each of the movements was made by a switching locomotive crew, under the direction and control of the yard master, without regular schedules, without block signals or markers, and always under the visual control of the locomotive engineer and his crew, and that the engine and cars were not assembled for road movement in any of them, but that the movements were part of the continuous switching operation which constitutes the railroad terminal service to the industry.

Plaintiff contends that 2.1 mile hauls by locomotives of cuts of cars varying in length from 47 to 84 cars as units, during which hauls no cars are picked up or set out en route, and the movements are uninterrupted, are train movements within the meaning of the Act requiring use of power brakes subject to the control of the engineer, and asserts that the air brake provisions of the Act are as mandatory in their application to terminal switching carriers engaged in transferring cars as to other carriers engaged in interstate commerce.

With one exception, the facts of the case, United States v. South Buffalo Railway Co., 2 Cir., 168 F.2d 948, certiorari denied, 335 U.S. 870, 69 S.Ct. 165, were very similar to those here involved, and the Court of Appeals held that the transfers were subject to the requirements of § 9. The movements there complained of took place wholly within an area operated as a single yard having no through trains passing over its tracks; they involved 15 cars which had been gathered together by various switching operations and transported as a unit at an average speed of 5 miles an hour for about two miles to points

where they were broken up for further switching movements. The District Court had held that the movements were not subject to the Act. In overruling this decision the Court of Appeals expressed some doubt, but it appears to have been greatly impressed by the evidence of an experienced Interstate Commerce Commission inspector as to the hazards involved in a private crossing at grade used by a considerable number of persons, stating: "We think it undesirable for the courts by their decisions to enable railroads to eliminate safety appliances where hazards undoubtedly exist to some substantial degree and where the use of such appliances would insure increased protection." [168 F.2d 952] The court cited and relied upon a number of cases which had held the Act applicable to short-run transfers of cars as a unit, noting, however, that the decisions relied upon involved not only the transfer of cars as a single unit, but also certain accompanying hazards on the route which were somewhat different from and perhaps greater than those in the case under consideration.

A number of earlier cases have considered the question of the character of transfer trains with respect to § 9, but for the most part they dealt with movements in part along main line tracks or crossing such tracks or over public crossings. Thus in United States v. Erie Railroad Co., 237 U.S. 402, 35 S.Ct. 621, 624, 59 L.Ed. 1019, the Court held that transfers between yards lying from 2 to 3½ miles apart, over main line tracks used by other freight trains both through and local, over switches leading to other tracks and across passenger tracks whereon trains were frequently moving were "engaged in main-line transportation" and came within the purview of the air-brake provision. Likewise, in the United States v. Chicago, Burlington & Quincy Railroad Co., 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023, it held that transfer trains between two yards lying two miles apart on opposite sides of the Missouri River, connected by a main line track along which passenger and freight trains moved, intersecting at grade 12 or 15 tracks of other companies and passing through Union Depot tracks, the transfer trains being moved as units and not infrequently both preceded and followed by other trains, were, under the rule in United States v. Erie, supra, subject to § 9 of the Act. Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757, involved transfers from one road to another, at speeds up to 15 miles an hour, in part over a track used as a main line by three railroads, crossing city streets at grade, thence over another main line track used by another road, and the Court held that such transfers were "train movements" under the Act. In United States v. Northern Pacific Railway Co., 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249, the Court held that transfers at speeds of 3 to 18 miles an hour for a distance of 4 miles, in part along a single track crossing two streets at grade, one used by streetcars, and with five rail crossings at grade, constituted main line transportation in the meaning of the Act.

■ The Act is, of course, mandatory in its requirement that all *trains* used on any railroad engaged in interstate commerce be controlled by air or power brakes. However, it contains no definition of "train," and it appears significant to us that in the cases referred to, holding the provision applicable, the element of hazard has loomed large. Thus the Court in the Northern Pacific case above, 254 U.S. at page 254, 41 S.Ct. at page 102, quoted the language of the earlier Burlington case, "'Not only were these * * * trains exposed to the hazards which that provision was intended to avoid or minimize, but unless their engineers were able readily and quickly to check or control their movements they were a serious menace to the safety of other trains which the statute was equally designed to protect.'" And it appears from its opinion that it was the element of hazard which impelled the Court of Appeals in the South Buffalo case to reverse the decision of the District Court, although admitting, in effect, that the case went further than any previously decided case, in holding a movement wholly within a single railroad yard, between two switching operations, subject to the requirements of § 9.

We are convinced that neither the Act nor the cases decided thereunder require a holding under the facts of this case that the movements here involved were "train movements" subject to the requirements of § 9. We take it that the distance travelled in the various movements is not itself a controlling factor, nor is the number of cars involved in the movements. We note the language of the Erie case, supra, "It will be perceived that the air-brake provision deals with running a train. * * * As the context shows, a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains * * *." We think that under the circumstances of this case, the movements here were simply among the "various movements" having to do with the assembling of trains, and were not, themselves, "train movements."

It appears to us that the entire business of the Gary Yards, considered as a whole, is in the nature of a continuous switching operation. While it is true that the particular movements singled out here involved cuts of cars moving as units without interruption for distances which, under the circumstances of other cases referred to were held to justify the application of the Act, we think no such occasion arises here for applying the Act. Here we have a large yard divided into a large number of sub-yards, and necessarily, movements within this yard and between the sub-yards involved long hauls. But using the criteria which we think are to be derived from the cases cited, we are convinced that the "essential nature of the work" remained the "switching, classifying and assembling (of) cars within railroad yards for the purpose of making up trains" "for a run or trip along the road," and not such a "run or trip" as required compliance with § 9 of the Act.

Judgment affirmed.