**The UNITED STATES of America, Plaintiff,**

v.

**The STATEN ISLAND RAPID TRANSIT RAILWAY COMPANY, Defendant.**

**Civ. A. 13987.**

United States District Court
E. D. New York.

June 14, 1957.

Leonard P. Moore, U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y., for the United States, by Myron Friedman, Asst. U. S. Atty., Long Beach, N. Y., and Henry L. Hilzinger, Atty. Interstate Commerce Comm., Washington, D. C., of counsel.

Robert Schwebel, and John C. Avery, New York City, for defendant, by John C. Avery, New York City.

BYERS, District Judge.

This cause involves an alleged breach of the Safety Appliance Act, 45 U.S.C.A. § 1 et seq., on the part of the defendant in connection with a movement of freight cars in its St. George Yard on Staten Island on September 16, 1953; the question for decision is whether that operation was so conducted as to incur the penalty which the Government seeks to exact, by reason of the failure of the defendant to cause the air brake system to be coupled from the engine to the freight cars being moved.

The complaint alleges two causes, a westerly movement from about the Yard Office to the plant of the U. S. Gypsum Company, of empty cars, and the reverse movement from that plant back to the Yard Office of a string of loaded cars and one empty.

The precise question is whether a train movement or a switching movement was involved in each instance—if the former, the penalty has been incurred; if the latter, it has not.

There are no contested questions of fact presented by the record.

The statute and order involved are:

Section 9, which deals with the necessity for the use of power or train brakes as to not less than 50% of the cars in a given train to be used and operated by the engineer of the locomotive drawing such trains.

The Interstate Commerce Commission duly issued an order dated June 6, 1910, increasing the 50% requirement to 85%.

It has been authoritatively decided that in construing the Safety Appliance Act, it is required to ascertain the essential nature of the work being done, in order to determine whether under given circumstances a train movement, or switching movement is disclosed in the evidence.

See United States v. Chicago, B. & Q. R. Co., 237 U.S. 410, 35 S.Ct. 634, 59 L. Ed. 1023; Louisville & Jeffersonville Bridge Co. v. U. S., 249 U.S. 534, 39 S. Ct. 355, 63 L.Ed. 757; United States v. Great Northern R. Co., 9 Cir., 73 F.2d 736, certiorari denied 295 U.S. 752, 55 S.Ct. 833, 79 L.Ed. 1696; United States v. Northern Pacific Ry. Co., D.C., 121 F. Supp. 397.

The present factual situation may be conveniently recapitulated as follows:

(1) The defendant's railroad property involved is clearly shown on U. S. Exhibit 1, which portrays the St. George Yard running from east to west along the northerly shore of Staten Island, terminating at the western end at a point west of the U. S. Gypsum plant, which lies north of the right of way. It will be seen that the tracks here involved curve to the left or south as a string of cars are moved in the westerly direction.

(2) The distance traversed by these cars is agreed to be 6,010 feet, namely the distance between the Yard Office and the place at the U. S. Gypsum plant where the westerly movement came to an end.

(3) The motor power was furnished by a 1,000 h. p. diesel locomotive No. 489; in the westerly movement there were 3 box cars and 8 hopper cars, all empty— of these, two cars were being pushed ahead by the diesel and nine were being pulled behind; in the easterly movement there were 9 loaded hopper cars, 1 empty box car and 1 loaded box car—of these, one box car was behind the diesel and the others were being pushed ahead.

The empty cars were left at the Gypsum plant, and the second movement was of cars, nine of which had been loaded there. The loaded cars, on reaching the Yard Office, were weighed and then routed as their several destinations required.

(4) On each movement the diesel was equipped with an automatic brake but there was no air brake connection between it and any of the cars being moved.

However, each car was properly equipped with air brake hose and connections so that if required, the air brake system would have been effective as to the entire string.

(5) There is no grade involved, since the entire stretch of track is practically level.

(6) There is no crossing, highway or otherwise, between the Yard Office and the Gypsum plant, namely, between Stations No. 41 and 51 as shown on U. S. Exhibit 1. The public was not admitted to the part of the St. George Yard here involved.

(7) The cars moved at a speed of 5½ to 6 miles an hour, which was customary in this Yard in the conduct of such an operation.

(8) There are industrial plants on the northerly side of the defendant's tracks between the Yard Office and the U. S. Gypsum plant, namely, that of Brighton Materials and those called the Jim Ball and Octagon Process plants, all of which are connected by sidings with the defendant's tracks, and switches which control access thereto.

(9) It was the practice of the defendant in conducting such a movement as the westerly one in this case, to include cars intended for one or more of those plants; in such an instance one or more cars would be detached and placed on those sidings, thus interrupting the movement to the Gypsum plant; such movements were switching and not train movements, and the Safety Appliance Act requirement here involved, would not then apply.

(10) On the westerly movement, these cars came to a full stop at the entrance to the main track at the coal dock lead (estimated at 1,700 feet from the Yard Office) and the brakeman lined up the switch for the movement.

(11) In neither movement was any main line track crossed.

(12) No passenger train moved on any of the tracks here involved.

(13) These movements were performed entirely by switching crews, namely, a crew of five, consisting of a conductor, an engineer, a fireman and two trainmen.

(14) In each movement there was a man stationed on the lead car to observe conditions and, if necessary, to signal the engineer to stop.

(15) There were no other trains of any kind on these tracks at any time during the movements here involved.

(16) These respective cuts of cars could be brought to a full stop by the operation of the automatic brake in the diesel, within from sixty to seventy feet; while if the air brakes had been coupled, the same result would have been accomplished in a distance of from fifty to sixty feet. In other words, the air brake connection would have brought either cut to a stop within a shorter distance of ten feet than was possible with the equipment actually employed.

(17) The automatic brake was of sufficient capacity to hold either of these cuts of cars at a full stop.

(18) Each freight car here involved was equipped with a hand brake.

(19) Both movements involved in this case were entirely within the St. George Yard of the defendant.

(20) There has been no accident of any kind in this Yard for the past thirty years, prior to which time no records are available.

(21) According to the defendant's rules, a train is thus defined: "An engine or more than one engine coupled with or without cars displaying markers."

No marker was carried by any car in either of the cuts involved in this case.

### Comment.

The evidence as a whole leads this court to the conclusion that in the challenged operations the defendant was conducting what was essentially in the nature of switching, not train, movements.

There have been many cases in which this question has been presented with differing results, depending of course upon the circumstances revealed in each record.

The only case in this circuit which is factually comparable is United States v. South Buffalo R. Co., 2 Cir., 168 F.2d 948, certiorari denied 335 U.S. 870, 69 S.Ct. 165, 93 L.Ed. 414. In reversing a deci-

sion of the District Court in favor of that defendant, 71 F.Supp. 461, the then Circuit Court of Appeals very carefully analyzed the evidence and owned to some doubt as to the necessity for reversal, but reached that result, if the opinion is presently understood, because of the presence of a crossing which created a hazard, and that in turn brought into operation the applicable section of the Safety Appliance Act.

At page 952, of 168 F.2d, the following occurs:

"We can see no essential difference however between a public crossing and the private way in the present case; indeed, a public crossing might have less traffic than the private one which intersected defendant's line."

Also, the court referred to the existing grade at the crossing thus:

"In the record before us there was testimony by an experienced interstate commerce inspector that the crossing and the existing grade at that point rendered the absence of air brakes dangerous."

There is no comparable showing in this case, since there was no crossing whatever in this Yard, and no grade.

The testimony of the Government's witness referred to above (to the effect that if there had been removed from either cut of cars one or more cars to be spotted at either of the plants on the northerly side of the defendant's track, all that would have been involved was a switching operation) indicates that as a practical matter it would be unreasonable from an operating standpoint, to require the coupling of air brakes to the locomotive where delivery of cars only at the Gypsum plant was required, while that necessity would not exist under the alternate circumstances.

The elements of danger pointed out by the Government's witness are these:

(a) That on the eastward movement (the second) the man riding the leading car would not be within the view of the engineer because of the curvature of the track. Admitting this to be so, it does not follow that the presence of air brakes would be important, for the vision of the engineer would not be thereby affected.

(b) To quote:

"Because in pushing cars ahead of an engine it maybe become detached and could run into some other object and cause damage."

It may seem presumptuous for an uninstructed person to offer a comment on that subject, but common sense reminds one that since each car carries a hand brake, and if one were to become detached, a trainman could in all probability operate the hand brake so as to bring it to a stop. Other cases have taught the lesson that hand brakes are so employed in switching operations where cars are deliberately cut off in order to enter a given siding or track.

It is concluded that the Government has failed to sustain its burden of proof that the defendant has violated the law, and therefore judgment on the merits in favor of the defendant is hereby directed. If findings in amplification of the foregoing are desired, they may be submitted on notice.

Settle judgment.