**UNITED STATES of America,**
**Appellant,**

v.

**Guy A. THOMPSON, Trustee, Missouri**
**Pacific Railroad Company, Appellee.**

**No. 15798.**

United States Court of Appeals
Eighth Circuit.

Jan. 29, 1958.

Leo Meltzer, Attorney, Department of Justice, Washington, D. C. (Warren Olney III, Asst. Atty. Gen., Osro Cobb, U. S. Atty., James W. Gallman, Asst. U. S. Atty., Little Rock, Ark., and Floyd R. Benny, Attorney, Interstate Commerce Commission, Washington, D. C., were with him on the brief), for appellant.

R. Ben Allen, Little Rock, Ark. (Pat Mehaffy, Little Rock, Ark., was with him on the brief), for appellee.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

This action was brought by the United States to recover statutory penalties for alleged violations of the Safety Appliance Acts, 45 U.S.C.A. §§ 1–16. Jurisdiction is based on 45 U.S.C.A. § 6. The complaint contained seven causes of action. Issues were joined and the case was tried to a jury, which returned a verdict in favor of the defendant (appellee) on each cause of action. Judgment was entered on the verdict. The Government has appealed from the judgment as to the Sixth and Seventh causes of action only, upon the grounds that the District Court erred in denying the Government's motion for a directed verdict in its favor and its motion, after verdict, for judgment notwithstanding, upon those two causes of action.

The Sixth cause of action stated in the complaint is that on March 26, 1955, the defendant operated over its tracks a train consisting of nineteen cars drawn by a diesel locomotive "from Track No. 7, Hold Yard, to Tie Plant, in and about North Little Rock, Arkansas, * * * when none of the cars * * * had their brakes used and operated by the engineer of the locomotive drawing said train," contrary to 45 U.S.C.A. § 9 and the order of the Interstate Commerce Commission of June 6, 1910, 49 C.F.R. 132.1, requiring that when a "train is operated with power or train brakes, not less than 85 per cent of the cars of such train shall have their brakes used and operated by the engineer of the locomotive * * *."

The Seventh cause of action is the same as the Sixth, except that it refers to a train of twenty-five cars operated from "Lead Track, Tie Plant, to Locust Street Yard, in and about North Little Rock, Arkansas."

There was no dispute as to the car movements of March 26, 1955, having been made substantially as alleged in the complaint "while the power brakes were in use on the locomotive only." [1] The

---

1. In response to requests by the Government for admissions, the following statements were made by the defendant:

"5. The defendant admits that on March 26, 1955 the defendant during a switching operation switched a cut of 19 cars by its Diesel Locomotive 9146 from its Track No. 7 in its 'hold' yard, North Little Rock, Arkansas, to what is known as the 'Tie Plant' in North Little Rock, Arkansas, while the power brakes were in use on the locomotive only. After leaving the 'hold' yard, the switching operations were continued upon the northward main track at 'Valley Wye' and continued northward on the main track for a distance of approximately one mile and a quarter until the train reached the tie plant connection, a total distance of between one and three miles. At that point, other switching operations were conducted on the main line and, after the necessary switching, all were switched into the tie plant and there left. The defendant does not have knowledge as to whether other cars were picked up or set out during the switching operations. One private road was crossed at grade during said operation.

"6. The defendant admits that on March 26, 1955 the defendant conducted switching operations with its Diesel

question was whether the movements were train movements or switching operations.

The record shows that the switching limits of the Missouri Pacific Railroad at North Little Rock include the areas known as the Hold Yard, the Locust Street Yard, and the Tie Plant; that switching limits are set up by agreement with the Railroad Union; that officers of the Railroad can set up yard limits, but not switching limits which constitute the area within which switching operations are conducted by switch crews; that the distance between the Tie Plant and the north end of the Locust Street Yard is a mile and a quarter; that from that end of the Locust Street Yard to its south end is 8,000 feet; that from the south end of that yard to the north end of the Hold Yard is around 2,200 feet, a half mile; that within this area train movements are controlled by electric signals; that in thirty-five years there has never been an accident in the area as a result of switching operations; that between the Hold Yard and the Tie Plant there are two private crossings, which "are gated and kept locked"; that switch movements to the Tie Plant are not scheduled; that the service is usually performed by the same switch engine on duty; that a number of switch engines operate within the area, and also road crews on engines doing road work, and yard crews within the switching limits doing switching work.

With respect to the movements in suit, the record shows that on March 26, 1955, a diesel locomotive of the switch-engine type, with nineteen cars attached, was in the defendant's Hold Yard; that all the cars had power brakes, but that the air was not coupled between the locomotive and any of the cars; that when the locomotive and cars left Track 7 they followed "Old Lead Track to the Valley 'Y'

[Wye] Connection," and then went onto the east or main track of the Missouri Pacific for 1.21 miles until they reached the Tie Plant, a total distance of 2.92 miles; that the movement did not exceed in speed fifteen miles an hour for the entire distance; that there was no stopping and setting out of a car or cars or taking on a car between the Hold Yard and the Tie Plant, and that the order in which the cars were assembled was not changed in any way; that the locomotive was stopped "clear of the track that goes into the Tie Plant"; that the locomotive was cut off, "reached into a lead track," and "got 25 loaded cars already lined up and together"; that the locomotive picked up the 19 cars on the main track, shoved all the cars onto the lead track of the Tie Yard, left the 19 cars there, and came out with the 25 cars; that, on the trip from the Tie Plant to the Locust Street Yard with the 25 cars, the movement traveled on the main line track for a distance of 1.21 miles, went onto the running track and onto the lead track to the Locust Street Yard, where the movement came to rest, a total distance of 1.71 miles; that the speed of the movement did not exceed 8 miles an hour; that on that movement the locomotive was pushing the 25 cars; that in the area where the movements in suit occurred, fast trains operate, and on the main line area out near the Tie Plant the speed limit for trains is 50 miles an hour.

■ It seems clear to us that what was done on March 26, 1955, which gave rise to this controversy was: (1) transferring 19 cars from the Hold Yard to the Tie Plant, a distance of slightly less than 3 miles, about a mile and a quarter of which was over a main line track; (2) setting out the 19 cars at the Tie Plant; (3) picking up the 25 cars at that plant and transferring them to the Lo-

Locomotive 9146 and twenty-five cars between the 'tie plant' to the 'hold' yard over the same route described in paragraph 5 above, but in the opposite direction. The defendant does not have knowledge as to whether cars were

picked up or set out in route. The power brakes were in use on the locomotive only. In this switching operation the main line track was used for approximately a mile and a quarter."

cust Street Yard, again using a main line track for a distance of a mile and a quarter.

It is our opinion that these movements were transfer movements, and not switching movements, and that whatever switching or interchange of the 19 cars for the 25 cars was done at the Tie Plant was merely incidental to these transfer movements.

■ It is our understanding that when cars are assembled at one point in a railroad terminal and moved intact a considerable distance for delivery at another point in the same terminal, the movement is not a switching operation but is, as a matter of law, a train movement, and particularly so when main line tracks are used or crossed. This Court held to the contrary in United States v. Northern Pacific Railway Co., 8 Cir., 255 F. 655, but was reversed by the Supreme Court, United States v. Northern Pacific Railway Co., 254 U.S. 251, at page 254, 41 S.Ct. 101, at page 102, 65 L.Ed. 249, in an opinion by Mr. Justice Brandeis, who said:

> "* * * It is admitted that this railroad is engaged in interstate commerce; and the cases cited [United States v. Erie R. R. Co., 237 U.S. 402, 35 S.Ct. 621, 59 L.Ed. 1019; United States v. Chicago, Burlington & Quincy R. R. Co., 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023, and Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757] show that transfer trains, like those here involved, are 'trains' within the meaning of the act [Safety Appliance Act]. A moving locomotive with cars attached is without the provision of the act only when it is *not* a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up

trains. Congress has not imposed upon courts applying the act any duty to weigh the dangers incident to particular operations; * * *."

In Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 538, 39 S.Ct. 355, 356, the Court said:

> "The work done with the cars, as described, was not a sorting, or selecting, or classifying of them, involving coupling and uncoupling, and the movement of one or a few at a time for short distances, but was a transfer of the 26 cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot therefore with propriety be called a switching movement."

On the question of transfer movements being train movements, see also and compare: Great Northern Ry. Co. v. United States, 8 Cir., 288 F. 190; Illinois Central R. Co. v. United States, 8 Cir., 14 F.2d 747; Chicago, St. P., M. & O. Ry. Co. v. United States, 8 Cir., 36 F.2d 670; United States v. South Buffalo R. Co., 2 Cir., 168 F.2d 948, 950–952; United States v. Panhandle & Santa Fe Ry. Co., 5 Cir., 203 F.2d 241, 245–247; United States v. Northern Pac. Ry. Co., D.C.Minn., 72 F.Supp. 528.

■ Our conclusion is that, under the evidence, the question whether the movements in suit were train movements or were switching operations was a question of law for the court and not a question of fact for the jury, and that the court erred in denying the Government's motion for a directed verdict on the Sixth and Seventh causes of action.

The judgment based on the verdict of the jury as to the Sixth and Seventh causes of action is reversed, and the case is remanded with directions to enter judgment for the United States thereon.