## UNITED STATES *v.* CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 630.　Argued January 7, 8, 1915.—Decided May 10, 1915.

Railroad yards belonging to the same railroad but several miles apart, such as those of the Chicago, Burlington & Quincy Railway at Kansas City on opposite sides of the Missouri River, are not actually one yard, and trains moving between them are not engaged merely in switching operations, but are engaged in transportation within the purview of the air-brake provision of the Safety Appliance Act.

211 Fed. Rep. 127, reversed.

THE facts, which involve the construction and application of the Safety Appliance Acts, are stated in the opinion.

*Mr. Assistant Attorney General Underwood* for the United States.

*Mr. H. M. Langworthy,* with whom *Mr. William Warner, Mr. O. H. Dean, Mr. W. D. McLeod* and *Mr. O. M. Spencer* were on the brief, for respondent.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This was an action for penalties under the law of Congress relating to safety appliances. Four violations were charged. One consisted in using a car with a defective coupler and the others in running certain transfer trains without having the requisite percentage of air brakes so connected that they could be operated by the engineer.

The first is no longer in controversy. As to the others the controverted question at the trial was not whether the air-brake requirement, if applicable, was violated, but whether it applied to such trains. The District Court, deeming the requirement applicable, directed a verdict and entered a judgment for the Government, and the Circuit Court of Appeals, being of a different opinion, reversed the judgment, one judge dissenting. 211 Fed. Rep. 12. A writ of certiorari granted under § 262 of the Judicial Code brings the case here.

The facts disclosed by the evidence are these: The defendant operates a railroad which passes through Kansas City, Missouri, and is used largely in interstate commerce. Among its terminal facilities at that point are two freight yards known as the Twelfth Street yard and the Murray yard. These yards are on opposite sides of the Missouri River, the distance between their nearest points being about two miles. The track connecting them is one by which passenger and freight trains enter and leave the city, in other words, a main-line track. For a distance of 3,000 feet it is upon a single track bridge spanning the river, and off the bridge it intersects at grade twelve or fifteen tracks of other companies and passes through the Union Depot tracks. Besides its use by the defendant's trains, a considerable portion of it is also the line by which the passenger trains and some of the freight trains of the Rock Island and Wabash railroads enter and leave the city.

Both yards are used for receiving and breaking up incoming trains, assembling and starting outgoing trains, and assorting, storing and distributing cars. To reach their ultimate destinations, whether on the defendant's road or on those of other carriers, a large proportion of the cars have to be moved from one yard to the other, and this is accomplished by transfer trains which are run over the main-line track connecting the yards. These

trains usually consist of an engine and about thirty-five cars, are operated by what are termed yard or switching crews, and carry no caboose or markers. They have no fixed schedules and are not controlled by a train dispatcher but by block signals, as are all other trains moving over the same track. Each train is moved as a unit from one yard to the other and not infrequently is both preceded and followed by other trains, passenger and freight.

The three trains, the running of which is charged to have been violative of the statute, were transfer trains of the class just described. They were run from one yard to the other on August 9, 1910, and were composed respectively of 42, 36 and 39 cars, of which only 9 in one train and 10 in each of the others had their air brakes connected for use by the engineer. At that time air brakes were required to be used on 75 per cent. of the cars in a train. 11 I. C. C. 429, 437.

Giving effect to the views quite recently expressed in *United States v. Erie Railroad Company, ante,* p. 402, we think these trains came within the air-brake requirement, which the amendatory act of 1903 declares "shall be held to apply to all trains . . . on any railroad engaged in interstate commerce." According to the fair acceptation of the term they were trains in the sense of the statute. The work in which they were engaged was not shifting cars about in a yard or on isolated tracks devoted to switching operations, but moving traffic over a considerable stretch of main-line track—one that was a busy thoroughfare for interstate passengers and freight traffic. Every condition suggested by the letter and spirit of the air-brake provision was present. And not only were these trains exposed to the hazards which that provision was intended to avoid or minimize, but unless their engineers were able readily and quickly to check or control their movements they were a serious menace to the safety of other trains which the statute was equally de-

· signed to protect.  That they carried no caboose or markers is not material.  If it were, all freight trains could easily be put beyond the reach of the statute and its remedial purpose defeated.  Neither is it material that the men in charge were designated as yard or switching crews, for the controlling test of the statute's application lies in the essential nature of the work done rather than in the names applied to those engaged in it.

The judgment of the Circuit Court of Appeals must therefore be reversed and that of the District Court affirmed.

*It is so ordered.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.