UNITED STATES v. GALVESTON, H. & H. R. CO.

(Circuit Court of Appeals, Fifth Circuit. February 8, 1919.)

No. 3196.

RAILROADS ⬤⇒229—SAFETY APPLIANCE ACT—USE OF AIR BRAKES—RUNNING OF TRAIN.

The movement by a switch engine of 30 to 50 cars, coupled together, some containing interstate shipments, for several miles, crossing main line tracks of several railroads and streets at grade, and for parts of the distance over main line track, although in a network of tracks commonly called the city yards, was not a switching operation, but the running of a train and the failure to connect up the air brakes so it could be controlled by the engineer constitutes a violation of Safety Appliance Act, § 2 (Comp. St. § 8614).

In Error to the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Action by the United States against the Galveston, Houston & Henderson Railroad Company. Judgment for defendant, and the United States brings error. Reversed.

John E. Green, Jr., U. S. Atty., of Houston, Tex., and Roscoe F. Walter, Sp. Asst. U. S. Atty., of Washington, D. C., for the United States.

S. W. McMeans and Claude Pollard, both of Houston, Tex. (Baker, Botts, Parker & Garwood, of Houston, Tex., John L. Darrouzet, of Galveston, Tex., and McMeans, Garrison & Pollard, of Houston, Tex., on the brief), for defendant in error.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

WALKER, Circuit Judge. This was an action for the recovery of penalties for alleged violations of the air brake provision of the Safety Appliance Act. Act March 2, 1903, c. 976, § 2, 32 Stat. 943 (Comp. St. § 8614). The petition contained four counts, the first of which, after setting out the order of the Interstate Commerce Commission, promulgated June 6, 1910, and becoming effective September 1st following, which had the effect of increasing the minimum number of cars whose train brakes must be under the engineer's control to 85 per cent., alleged that the defendant (defendant in error here)—

"on March 28, 1917, operated on its line of railroad one train, to wit, its own transfer consisting of 57 cars, drawn by locomotive engine G., H. & H. No. 13, said train being one operated with power or train brakes over a part of a highway of interstate commerce. * * *

"Plaintiff further alleges that on said date defendant operated said train as aforesaid over its line of railroad, in and about Galveston, in the state of Texas,

within the jurisdiction of this court, when none of said cars in said train had their brakes used and operated by the engineer of the locomotive drawing said train, and when less than 85 per cent. of the cars which composed said train had their brakes used and operated or so assembled and connected that they could be used and operated by the engineer of said locomotive engine drawing said train."

The averments of each of the other counts were the same, except that they averred the operation on March 29, 1917, March 30, 1917, and March 31, 1917, respectively, of trains consisting of 43, 31, and 49 cars respectively. The evidence adduced showed that each of the movements testified to of an engine with the alleged number of cars attached was within the area of the strip of land on the northern side of Galveston Island, extending eastwardly a distance of about 5 miles from a station a short distance east of a bridge connecting the western end of the island with the mainland, over which the trains of several railroads pass in going to or from Galveston. That area is traversed by a number of city streets and by a multitude of tracks belonging to and used by different railroads and the Galveston Wharf Company, a connecting carrier between the railroads entering Galveston and the wharves along the city's water front. Evidence offered in support of the first count showed the following state of facts:

Defendant's locomotive No. 13, having 57 cars attached, pushed them in an easterly direction from what is known as defendant's old west yard to the east yard of the Galveston Wharf Company, a distance of 4 miles. In so doing it crossed at grade a number of the city's streets which were open for traffic and were in use, also the main line tracks of several other railroads, over which a number of trains pass daily, and used about 400 feet of a track which is the passenger main track in daily use for interstate trains of the defendant and two other railroad companies. At another place it used about 100 feet of the defendant's main line. It passed through two interlocking plants, one at Fifty-First street and the other farther east at Thirty-Sixth street, the former of which is so constructed that, when a train is using one of the tracks within the plant, another train cannot use such track, being prevented from doing so by a derailing device, while the latter is not equipped with the device mentioned. In the movement the east-bound main track of the Galveston Wharf Company was used for a distance of about 1½ miles. In making the movement cars were set out at two places, 8 cars at one place and 16 cars at another.

Evidence offered in support of the other counts showed similar states of fact, the principal differences being in the number of cars moved, and that the evidence offered to support the second count showed that the distance moved was about 3.4 miles, and no cars were set out before the movement ended; that the evidence offered to support the third count did not show the exact distance, but disclosed that it was several miles, and showed that all the cars were pushed to where the movement stopped, except one, which became defective en route and was set out at what was called the middle yard; and that the evidence offered to support the fourth count showed that the distance moved was about 3.8 miles, and that cars were set out at two places, 15 cars

at the middle yard and 22 cars on a track of the Galveston Wharf Company.

Each movement was made without having the air coupled up between the engine and the cars moved, and none of the cars moved had their brakes used and operated by the engineer of the locomotive to which the cars were attached. At the times of the movements in question the defendant was a common carrier engaged in interstate commerce by railroad. Each of the transfers contained interstate freight. The engine was known as a switch or yard engine. Its crew was known as a yard crew. The movements and the tracks used in them were under the control of the yardmaster. The speed of each of the movements was 6 to 8 or 9 miles an hour. There was judgment in favor of the defendant pursuant to a verdict which the court directed.

The record discloses that the action of the court in directing a verdict in favor of the defendant was the result of the conclusion that the movements in question were switching movements, and were not within the meaning of the provision of the statute making it unlawful for a common carrier engaged in interstate commerce by railroad to "run any train" in such traffic without having a sufficient number of the cars so equipped with power or train brakes that the engineer on the locomotive can control the speed of the train "without requiring brakemen to use the common hand brake for that purpose." We do not think that in any material respect the movements in question were different from those which in two recent cases were held by the Supreme Court to have been such train movements as are prohibited and penalized by the statute. United States v. Erie Railroad Co., 237 U. S. 402, 35 Sup. Ct. 621, 59 L. Ed. 1019; United States v. Chicago, Burlington & Quincy Railroad Co., 237 U. S. 410, 35 Sup. Ct. 634, 59 L. Ed. 1023. In the opinion rendered in the first-cited case, the court, in the statement of the grounds relied on to support the conclusion that the movements there in question of transfer trains from Jersey City and Weehawken to Bergen, and vice versa, over tracks of the defendant, were not mere switching operations, but were train movements within the meaning of the statute in question, said:

"As the context shows, a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains and whereby incoming trains which have completed their run are broken up. These are not train movements but mere switching operations, and so are not within the air brake provision." United States v. Erie R. Co., supra, 237 U. S. 407, 35 Sup. Ct. 624, 59 L. Ed. 1019.

In speaking in the last-cited case of movements which were held to be within the prohibition of the statute, the court said:

"According to the fair acceptation of the term they were trains in the sense of the statute. The work in which they were engaged was not shifting cars about in a yard or on isolated tracks devoted to switching operations, but moving traffic over a considerable stretch of main line track—one that was a busy thoroughfare for interstate passengers and freight traffic. Every condition suggested by the letter and spirit of the air brake provision was present. And not only were these trains exposed to the hazards which that

provision was intended to avoid or minimize, but unless their engineers were able readily and quickly to check or control their movements they were a serious menace to the safety of other trains which the statute was equally designed to protect. That they carried no caboose or markers is not material. If it were, all freight trains could easily be put beyond the reach of the statute and its remedial purpose defeated. Neither is it material that the men in charge were designated as yard or switching crews, for the controlling test of the statute's application lies in the essential nature of the work done rather than in the names applied to those engaged in it." United States v. Chicago, Burlington & Quincy R. Co., supra, 237 U. S. page 412, 35 Sup. Ct. 635, 59 L. Ed. 1023.

The engine and cars, the movements of which are in question in the instant case, were assembled and coupled together for runs or trips, each of a distance of several miles. In those trips they crossed main line tracks of several railroads and streets at grade, and moved over stretches of main line track. The movements made were not kept from being runs or trips along the road by the circumstances that the tracks used were part of the network of tracks referred to generally as the Galveston yards and that main line tracks were used in only parts of the runs. There was no material difference between the unit formed by the assembling and coupling together of the engine and cars before each of the movements began and a train made up for a run to another station. It cannot properly be said that the movement throughout consisted of operations whereby the previously formed unit was broken up. Nothing occurred while either of the movements was in progress which was materially different from what might have occurred if the movements had been to points beyond the yard limits. A result of each of the movements was that interstate freight was carried over an interstate railway thoroughfare to a point several miles nearer to its ultimate destination. The fact that there are switching operations before such a movement is completed does not have the effect of making the entire movement one which does not come within the prohibition of the statute. What was done included more than such shifting of cars while not controlled by the engineer by power or train brakes as properly may be regarded as not forbidden by the statute.

For the reasons above indicated, the conclusion is that the court erred in directing a verdict for the defendant. Because of that error the judgment is reversed.