## UNITED STATES v. TEXAS & N. O. R. CO. et al. (two cases).

(District Court, S. D. Texas, at Houston. May 8, 1926.)

Nos. 700, 765.

Railroads ⬅➡229—Distribution of cars to industries for unloading, though using main line, held not "train movement," requiring use on cars of power brakes (Safety Appliance Act, § I [Comp. St. § 8605]).

An industry engine, drawing a string of 27 freight cars over the main track of a railroad for a mile at an average speed of 5 miles an hour, and stopping at intervals of about 100 yards to shunt cars over a spur track to industries for unloading, *held* not a "train movement," which under Safety Appliance Act, § 1 (Comp. St. § 8605), and order of Interstate Commerce Commission of September 1, 1910, required the use of power brakes on 85 per cent. of the cars, especially where the engine was using power brakes.

At Law. Two actions by the United States against the Texas & New Orleans Railroad Company and others. Judgments for defendant.

H. M. Holden, Dist. Atty., and Howell Ward, Asst. Dist. Atty., both of Houston, Tex., for the United States.

Garrison & Watson, of Houston, Tex. (R. L. Arterbury, of Houston, Tex., of counsel), for defendants.

HUTCHESON, District Judge. In the above cases the United States government, as plaintiff, has charged the defendants with a violation of the act of Congress known as the Safety Appliance Act, approved March 2, 1893 (27 Stat. 531), as amended by an act approved April 1, 1896 (29 Stat. 85), as amended by an act approved March 2, 1903 (32 Stat. 943), and as modified by an order of the Interstate Commerce Commission of June 6, 1910; the original act purported to have been violated being as follows:

"From and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving wheel brake and appliances for operating the train brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." Comp. St. § 8605.

The amendment approved April 1, 1896, fixes the penalty of $100 for each and every violation of said act. The amendment approved March 2, 1903, fixes the minimum number of cars to be operated by train brakes and is as follows:

"Whenever, as provided in said act, any train is operated with power or train brakes, not less than fifty per centum of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power-braked cars in such train which are associated together with said fifty per centum shall have their brakes so used and operated; and, to more fully carry into effect the object of said Act, the Interstate Commerce Commission may, from time to time, after full hearing, increase the minimum percentage of cars in any train required to be operated with power or train brakes, which must have their brakes used and operated as aforesaid; and failure to comply with any such requirement of the said Interstate Commerce Commission shall be subject to the like penalty as failure to comply with any requirement of this section." Comp. St. § 8614.

The order of the Interstate Commerce

Commission, that became effective September 1, 1910, provides that not less than 85 per cent. of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train.

The agreement of the parties as to the facts and the testimony of the witness O'Donnell is to the effect that on the dates named in the complaint stated in case No. 700 an engine with 27 cars left a point known as the Hardy Street yards, the cars to be distributed at their several points of placement for unloading along the route to a point designated as the Chaney yards, about one mile distant from the Hardy Street yards, there being 18 industries to receive the said 27 cars scattered along the route, being located at intervals of about 100 yards. The term Chaney yards was used merely as a term of designation, and not of description; the point being not, in fact, a separate yard. There was a main line track, over which freight trains of the defendant operated, extending from Hardy street to and beyond the point designated as Chaney yards, and the engine, while distributing the said 27 cars, moved over this main line track, though it switched off and on the said main line track, as was necessary to "spot" each car at the industry where it was to be unloaded; there being a spur track loading from the main line to each industry. Thus there would not be a continuous movement over the main line at any time for a distance of more than 100 yards. The engine was known as an industry engine, and was used only for the purpose of spotting the cars to the various industries where they were to be unloaded, and for pulling or pushing the cars operated at an average speed of about 5 miles per hour, possibly at times attaining a speed of 8 or 10 miles an hour, though such speed could rarely be obtained, due to the short distance run after starting before the train was stopped.

The testimony showed that the engine was equipped with automatic air brakes, and the movements involved could never attain such speed but that it could be stopped just as quickly with the automatic brakes of the engine as it could be stopped with 85 per cent. of the cars operated "under air." The facts further show that, while operating over the route described, the engine was at times upon the main line and crossed at grade certain streets. The movement was fully protected by watchmen and signals, and was always under control, so an emergency stop could be made just as quickly as if the cars were being operated "under air."

The facts in case No. 765 are similar to those above described, with the exception that in the latter numbered case, the line upon which the engine moved traversed the main line of the Trinity & Brazos Valley Railroad Company. The evidence showed in this instance, however, as in each instance where the engine moved over the main line or crossed the main line of the other road, it was protected by the interlocking devices, so that there could never be a collision with any other train. The evidence further was that it would be practically impossible to perform the service with the switching operation of cutting in and out in connection with air brakes, on account of the constant cutting out of the cars.

As counsel for the government well states it: "If the movement comes within that class known in law as switching, there can be no question that there is no violation of the act. If, however, the movement can be termed a 'train,' within the meaning of the authorities, the defendant must be found guilty of its violation." It must at the outset be observed that the act does not except trains moved in a switching service. It covers generally all train movements, and switching movements are not excepted as such, but are excepted because, in the course of executing the same, no "trains," in the sense of the law, are "moving over the line."

The decisions show that, while there is no difficulty in applying the act to ordinary main line train movements, and none in refusing its application to ordinary yard switching movements, there is a twilight between the two which, like a veritable "No Man's Land," has been the scene of judicial struggles of no mean magnitude, in the course of which expressions have been thrown out which, considered apart from their context, but serve to confuse. For instance, though operation on a main line has been often mentioned as a significant fact, in United States v. Northern Pacific, 254 U. S. 253, 41 S. Ct. 101, 65 L. Ed. 249, in which no part of the movement was accomplished on the main line track, the Supreme Court held the act applicable. Also it has been held that the fact of the work being done with a switching crew and a switch engine is only evidential, and by no means controlling of the issue; for, as said in United States v. C., B. & Q. R. R., 237 U. S. 410, 35 S. Ct. 634, 59 L. Ed. 1023, the claim that "they carried no caboose or markers is not material. If it were, all freight trains could easily be put beyond the reach of the statute, and its remedial purpose de-

feated. Neither is it material that the men in charge were designated as yard or switching crews, for the controlling test of the statute's application lies in the essential nature of the work done, rather than in the names applied to those engaged in it."

But it must be conceded that the use of the main line, that whether the crews were switching crews or not, that whether the work was done on tracks set apart for switching operations or within the definite limits of a yard, are all evidential matters, to which the court may look to determine the essential nature of the operation. In United States v. Erie R. R., 237 U. S. 402, 35 S. Ct. 621, 59 L. Ed. 1019, the court said that the air brake provision deals with running trains as a unit, and that the statute used the word "train" as an engine and cars which had been assembled or coupled together for a run or trip along the road. "But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains and whereby incoming trains which have completed their run are broken up. These are not train movements but mere switching operations, and so are not within the air brake provision."

In Louisville & Bridge Co. v. United States, 249 U. S. 538, 39 S. Ct. 355, 63 L. Ed. 757, the court said: "The work done with the cars, as described, was not a sorting, or selecting, or classifying of them, involving coupling and uncoupling, and the movement of one or a few at a time for short distances, but was a transfer of the 26 cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot, therefore, with propriety be called a switching movement."

No case has been cited by the government or the defense in which the facts were the same as here, where the cars were moved for short distances, and were constantly being cut out and cut in again. The only cited case whose facts even approximate it is that of United States v. Galveston, H. & H. R. Co., 255 F. 755, 167 C. C. A. 101, in one movement of which there were cars set in two places, 8 cars in one and 16 in another, a distance of a mile and a half, and another movement of 3.8 miles in which cars were set out at two places, 15 cars at the middle yard and 22 cars on the track of the Galveston Wharf Company. There the court stated correctly that the fact that switching operations occur before a movement is completed does not have the effect of making the

entire movement one not within the prohibitions of the statute, or the whole Act as to interyard movements could be defeated.

This case, then, must be determined, not upon the authority of the preceding cases, but in the light shed by them by reasoning applicable to this particular state of facts. That the engine and cars in this case, coupled together and constituting by reason of their union a single unit, can be described in one word only as a train, I think admits of no dispute, and if the matter could be disposed of thus simply, upon a dictionary basis, the government should have a verdict. That it cannot be so disposed of is established by the authorities, which have denied that a switching movement, though conducted by an engine coupled with linked cars, and therefore a train, was a train movement, within the meaning of the act, thus establishing that it is not the appearance, but the work performed by the unit thus created by the coupling of the cars, which determines the applicability of the statute.

Applying this criterion, I think it cannot be doubted that the movement described in this evidence, whereby cars pulled along a track for the purpose of every 100 yards or so shunting one into an industry is not a train, but rather the movement of a number of cars linked together, not for the purpose of forming a train, but for the purpose of enabling them to be switched and shunted by a switching operation in and out of industries, whose industry tracks feed off of the line used by the engine for the handling of its attached cars.

I think it would be unquestioned that the operation was a switching operation, if it had taken place entirely within a yard, and not over a main line. I cannot believe that the mere fact that the operation took place on a track used mainly as a feeder for industries, though it is also used for main line purposes, can make the statute applicable, for the words "main line" are not even mentioned in the statute, and in United States v. N. P. R. Co., 254 U. S. 254, 41 S. Ct. 101, 65 L. Ed. 249, it was said: "There is nothing in the act which limits the application of the provisions to operations on main line tracks." Louisville & Bridge Co. v. U. S., 249 U. S. 538, 39 S. Ct. 355, 63 L. Ed. 757, supra, held that if the work done with the cars was a sorting or selecting or classifying of them, involving coupling or uncoupling, and the movement of one or a few at a time for short distances, it would not be a train movement, "for the controlling test of

the statute's application lies in the essential nature of the work done, rather than in the names applied to those engaged in it." U. S. v. Erie, 237 U. S. 402, 35 S. Ct. 621, 59 L. Ed. 1019.

I am therefore of the opinion, and will so find, that the operations in question would not constitute train movements, within the meaning of the statute, and that the verdict should in each case go for the defendant.