### UNITED STATES v. PANHANDLE & SANTA FE RY. CO.

### PANHANDLE & SANTA FE RY. CO. v. UNITED STATES.

No. 14192.

United States Court of Appeals
Fifth Circuit.

April 8, 1953.

A. W. Christian, Asst. U. S. Atty., Ft. Worth, Tex., Leo Meltzer, Atty., Department of Justice, Washington, D. C., Frank B. Potter, U. S. Atty., Fort Worth, Tex., Floyd R. Benny, Atty. Interstate Commerce Commission, Washington, D. C., of counsel, for appellant.

Lewis Jeffrey, Amarillo, Tex., Adkins, Folley, Adkins, McConnell & Hankins, Amarillo, Tex., Wigley, McLeod, Mills & Shirley, Galveston, Tex., for appellee.

Before HOLMES, RUSSELL and STRUM, Circuit Judges.

### RUSSELL, Circuit Judge.

As this case reaches us it involves five claimed violations of the Safety Appliance Act[1] and the order of the Interstate Commerce Commission of June 6, 1910, issued in accordance with the provisions of that Act. In each of the five counts of its complaint, the United States, seeking recovery of the penalty provided by the statute, specified a movement of an engine and cars, which it contended constituted a train movement in violation of the air brake provision of the Safety Appliance statute in that "none of the cars in said train had their brakes used and operated by the engineer of the locomotive drawing said train, and when less than 85% of the cars which composed said train had their brakes used and operated by the engineer of said locomotive engine drawing said train." The defendant admitted that the air was not connected on any of said moves. The defense was solely that each of said moves was a switching movement to which the statute was not applicable. Defendant demanded a trial by jury. At the close of the evidence both parties filed motions for an instructed verdict upon each of the five causes of action in accordance with their respective contentions. The Court granted plaintiff's motions as to the first, third and fifth counts, and granted defendant's motions as to the second and fourth counts. Verdicts and judgments were entered accordingly, and both parties have appealed.

Each of the five moves involved was made in and about Amarillo, Texas, and within the Amarillo Yards. Numerous industries which are served by industry tracks are adjacent to the yard limits. The outer limits of the yards are between 6 and 7 miles apart at the point of greatest distance. Entering from the west the main line of the defendant passes through the yard and crosses the tracks of the Fort Worth and Denver City Ry. Company, and also the tracks of the C., R. I. & P. R. R. Company, referred to hereinafter as Fort Worth and Rock Island, respectively, and after such crossing branches with one line extending northward to Boise City, called the Dumas Branch, and another leading eastward to Canadian. The Rock Island also branches in the yard and this branch is crossed by the defendant's Dumas Branch. All of these carriers have depots, freight warehouses, switching tracks, interchange tracks and classification yards within the Amarillo Yards.

As shown by a map of the yards, the defendant's classification yard, referred to as the West Yard, is located to the left, or west, of the major portion of the Amarillo Yards and the tracks of Fort Worth and those of Rock Island. The points where these lines converge and cross is protected by an interlocking plant, controlled from what is denominated East Tower. Beyond the interlocking plant, and some five miles from the classification yards of defendant on its Dumas Branch, is located the Amarillo Stock Yards. It is served by an industry track. Southwesterly of East Tower, and the point of convergence and crossing of the lines of the three carriers, is located the Western Stock Yard Corporation, some two miles from the West Yard, or classification tracks, of the defendant. East of the point of convergence and crossing of the three main lines are the interchange tracks of the defendant and the Rock Island. These tracks are some two miles from the defendant's West Yard. Each of the movements here in question moved within the

[1]. 45 U.S.C.A. §§ 1 and 9.

interlocking plant. The briefs tell us that an interlocking plant is a system or arrangement of levers, switches, lights and derails so interconnected that they must be arranged in a predetermined order for the selected movements of the plant. In the case of this plant, the movements are controlled by an operator in the East Tower who determines the priority of movement as between trains on the different railroads that attempt to use at the same time the area defined by the limits of the interlocking, and by manipulating levers indicates that fact by a system of lights. Rails which do not have priority are broken at points about 400 feet in advance of the crossings by means of what is called a "split-rail" derail.

The defendant's arriving trains are broken up, and departing trains are made up, in the West Yard only. Cars are separated and re-grouped for movement in units from that yard to the interchange tracks with the other railroads serving Amarillo, or to industry tracks. All cars received from the industries or other railroads are moved to West Yard and are assembled into outgoing trains. All of defendant's classification work is performed in the West Yard.

With this background, sketchily drawn, the five movements may be described as follows. Charged as the first cause of action is the movement of 18 stock cars from the classification yards to Western Stock Yard as a unit. The movement was made in an eastward direction over the defendant's western main freight track for a distance of 1½ miles to a point past East Tower, and thence for a distance of ½ mile on a track leading to Western Stock Yard. One stop was made opposite the train signal at the Amarillo passenger station when the locomotive which had been pulling the cars was detached from the east end and run around and coupled to the west end. The cars were then pushed to Western Stock Yard. The movement crossed at grade the main tracks of Fort Worth within the limits of the East Tower Interlocking while moving westward along the freight main tracks and crossed Browning and Manhattan Streets while moving along the tracks to the Western Stock Yard. Speed did not exceed 15 miles per hour and was reduced to 4 or 5 miles per hour at grade crossings.

The fifth cause of action involved 13 freight cars which were assembled by defendant on the stock pen tracks of the Western Stock Yard and moved as a unit to the tracks in West Yard. This was the reverse of the movement just related and it traveled in a westward direction. The tracks and distances are the same as involved in Count 1.

The third cause of action involved the movement of 13 freight cars from the stock pens track of Amarillo Stock Yards as a unit to West Yard, a total distance of 5 miles. This movement was made in a westward direction over the main track of the Dumas Branch to its junction with defendant's main line from Canadian, and thence over the westward main freight track to West Yard. This movement crossed at grade U. S. Highway 66, Sanborn Avenue, Grand Street, Northeast Third Street and Manhattan Street. The Highway and Grand Street are heavily traveled at all times and Manhattan Street is heavily traveled part of the time. Only the Highway crossing is equipped with an automatic warning device for vehicular traffic. This movement also crossed at grade, within the limits of East Tower Interlocking, the main track of the Rock Island Liberal Branch, the main track of Rock Island to Oklahoma City and the main track of the Fort Worth. The speed of this movement was the same as stated with reference to the others.

The movements charged as violations in the three above counts are those which the Court adjudged to constitute train movements and thereupon directed a verdict for the Government.

The second cause of action involves the movement of 16 freight cars from the West Yard as a unit to the Rock Island Interchange track. This movement was made in an eastward direction over the eastward freight main track for a distance of 1½ miles to a point near East Tower where it crossed over to the westward freight

main track and continued on in an eastward direction for a distance of ½ mile to the interchange track. No cars were picked up or set out enroute. One stop was made when the locomotive was detached to switch a car, not one of the cars being moved to the interchange, to an industry track, whereupon the locomotive returned to the main track, coupled on to the 16 cars and moved them to the interchange track. In this movement the main tracks of the Fort Worth and the Rock Island were crossed at grade within the limits of the Interlocking Plant. Speed was similar to that above stated.

The fourth cause of action involves the movement of 23 cars as a unit from West Yard to the Rock Island Interchange Track. The route and manner of travel, except for the one switch, was the same as set forth in the second cause of action referred to just above.

On these counts, the Court, finding that these were not train movements, directed a verdict in favor of the defendant railroad.

It will be observed that from the standpoint of railroad operating safety there is no substantial difference between any of the movements in question, and in each main lines of the road were traversed for a substantial distance. However, the movements complained of in the second and fourth causes of action did not cross any streets or highway. It is apparent from the record that the trial Court gave controlling weight to the absence of such highway and street crossing and that this accounted for the contrasting verdicts which he directed the jury to render.

The Government strenuously insists that each of the five movements is clearly a train movement and therefore subject to the requirement of the statute. The defendant railroad vigorously contends that all the movements were switching operations so that the action of the Court in directing a verdict in its favor on the second and fourth causes of action was entirely proper, but for the same reason the direction of the verdict against it on the other counts was manifestly erroneous. It contends alternatively that in any event the issues should have been submitted to the jury. As a part of this latter contention, it is urged that if it be held that the issues should all have been submitted to the jury its case has been prejudicially affected by the rulings of the Court declaring inadmissible its proffered testimony to show: that under the circumstances involved the air brake coupling of the cars would impose a heavy operational burden and expense on the defendant; that the use of air brakes in switching was not feasible and that shippers of cattle objected to such use; that sudden stopping of cars by the use of air brakes was hazardous to brakemen riding on the cars; the destination of cars after they reach the Rock Island Interchange; testimony of witnesses as to whether the movements were train or switching movements and rules as to defendant's operating movements, and refusal to admit excerpts from a tariff filed with the Interstate Commerce Commission, which it is claimed showed that such movements were not considered to be train movements.

However, the defendant's chief and primary ground of attack upon the disposition which the Court gave to the causes against it is that the movements in question were switching movements because, first, they were all made within a single yard, and, second, they were each only an incidental and component part of a day's switching work by a switching crew. It is said that all well considered or controlling decisions[2] which have held trans-

**2.** Citing and so distinguishing those cases: U. S. v. Erie Railroad Co., 237 U.S. 402, 35 S.Ct. 621, 59 L.Ed. 1019; U. S. v. Chicago, B. & Q. R. R. Co., 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023; Louisville & J. Bridge Co. v. U. S., 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757; U. S. v. Northern Pacific Ry. Co., 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249; Chesapeake & O. Ry. Co., v. U. S., 4 Cir., 226 F. 683; U. S. v. Galveston, H. & H. R. Co., 5 Cir., 255 F. 755; Id., 5 Cir., 265 F. 266; U. S. v. Texas & N. O. R. Co., D.C., 13 F.2d 429; U. S. v. Southern Pacific Co., 9 Cir., 60 F.2d 864; Great Northern Ry. Co. v. U. S., 8 Cir., 288 F.

fer movements to be trains within the statute have dealt with situations where the movement was from one yard to another, and that intra-yard movements have been adjudged switching movements. As to the second point, and relying upon the test of "the essential nature of the work being done",[3] the defendant points to the evidence that the movements in question constituted only a minor part of the otherwise switching duties performed by the switching crew as a part of the work on their eight hour shift during which numerous switching movements were performed.

It is clear that since the statute involved provides no specific definition of a train, the Courts are required to consider and determine each case upon its own facts. Consequently, it is a rare instance where precedents are of any clear and controlling effectiveness.[4] Manifestly, however, the statute contrasts "train" movements with switching movements. But it does not simplify the question to circumlocute either that a train movement is not a switching movement or that a switching movement is not a train movement. In testing the matter of compliance with the statute, the question is whether the facts show a train movement. In making this determination, the decisions, to some of which we have referred, usually consider, among other matters, the similarity of the movement in question to the usual line haul, the distance involved, the possibility of contact or hazard with other trains, and the evidenced statutory intention to attain safety of operation for other trains and railroad employees. The extent or presence of these features in the movement in question are compared and contrasted with the operations of switching, classifying and assembling cars within railroad yards for the purpose of making up a train and the resulting determination is dependent upon within which of these classifications the Court is convinced the operation in question falls. Possibility of injury to vehicular traffic and pedestrians upon street grade crossings has been also weighed in determining whether the statute has been violated, but the validity of this feature as a controlling element is subject to question, especially unless it be borne in mind that absence of street crossings upon the route of a movement of locomotive and cars is only evidentiary upon the case as a whole and does not alone change a train movement to a switching operation. We think, in the present case, that the trial Court fell into error in permitting the absence of any street crossing upon the route of the transfer of the units from the West Yard to the Rock Island Interchange tracks to induce its finding to the effect that such movement was a switching movement and not a train movement.

As stated, each case must be determined on its facts, although we accept such assistance as we can secure from prior adjudications. We have considered the evidence here in the light of these principles. The facts have been outlined, and there is no occasion for any further lengthening of this already lengthy opinion. We think the evidence establishes as a matter of law that each of the transportations charged against the defendant constituted a "train" within the terms of the statute. Consequently, the defendant's admitted failure to have and use the connected air brakes rendered it liable to the penalties sued for.

The ruling of this Court in U. S. v. Galveston H. & H. R. Co., 255 F. 755, requires rejection of the contention urged here by the railroad company that the intra-yard nature of the movements removed them from the reach of the statute. The consideration which the Courts should give to "the essential nature of the work being done" is the nature of the work done in transporting the movement in question,— the essential nature of the work done by the engine and crew at the time of such transportation.

We conclude that upon the evidence ad-

190; Chicago & E. R. Co. v. U. S., 7 Cir., 22 F.2d 729.

3. U. S. v. Erie Railroad Co., supra.

4. This is illustrated in U. S. v. Chicago, B. & Q. R. Co., 7 Cir., 199 F.2d 223, 226.

mitted the Court should have instructed a verdict for the plaintiff on all counts of the complaint. This conclusion is not altered by the evidence which the defendant contends the Court erroneously excluded. The Court allowed much latitude to the defendant in presenting its defense, and permitted it to make for the record a full presentation by the witnesses of what was proposed to be shown. This we have considered, and find no reversible error in its rejection.

Upon the appeal of the railroad the judgment is affirmed. Upon the appeal of the United States the judgment is reversed and the cause remanded for proceedings consistent herewith.

Judgment affirmed in part, and in part reversed.