**UNITED STATES v. ST. LOUIS–S. F. RY. CO.**

Civ. A. No. 5196.

United States District Court
W. D. Oklahoma.

June 8, 1953.

---

Leonard L. Ralston, Asst. U. S. Atty., Oklahoma City, Okl., for plaintiff.

Satterfield, Franklin & Harmon, Oklahoma City, Okl., for defendant.

WALLACE, District Judge.

The plaintiff, The United States of America, brings this action against St. Louis-San Francisco Railway Company charging the defendant with violating certain provisions of the Safety Appliance Act, as amended,[1] and asks for $100 on each of the the three causes of action.

In its first cause of action the plaintiff alleges that the defendant on May 31, 1951, operated a diesel drawn train of nineteen cars in interstate commerce, in and about Oklahoma City, Oklahoma, "when none of the cars in said train had their brakes used and operated by the engineer of the locomotive drawing said train" which was in violation of the federal law requiring that:[2]

> "not less than 85 percent of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power-braked cars in every such train which are associated together with the 85 percent shall have their brakes so used and operated."

The defendant admits and confesses the allegations contained in plaintiff's second and third causes of action, but expressly denies that the operation referred to in the first cause of action was a "train" movement within the meaning of the Safety Appliance Act; defendant insists that the movement in question was a mere "switching" operation.

The case has been submitted to the Court upon the following "Stipulation of Facts":

1. The East Yard of defendant is the only point in Oklahoma City where trains are broken up and assembled.

2. The movement here complained of, consisting of 19 cars with defendant's diesel locomotive No. 546 attached thereto, was first observed on the main line track near the defendant's East Yard office. It departed from that point at 10:29 a. m. with the locomotive in the lead and moved westward over the main line track, traveling on said track a distance of approximately 3,000 feet, where a stop was made on the main line with the locomotive approximately 100 feet west of the Santa Fe overpass and the last car near to and west of the switch leading to the Frisco freight house lead track, the cars blocking Santa Fe Avenue.

1. Title 45 U.S.C.A. §§ 1–16.
2. Title 45 U.S.C.A. § 9, as modified by an order of the Interstate Commerce Commission of June 6, 1910.

3. The locomotive then began shoving the cars in a reverse movement off the main line on to the freight house lead track, over which it moved for a distance of approximately 1,800 feet and crossed a private crossing at grade, to a point south of and near to the Rock Island double track main line crossing, where a stop was made for the switchman to operate the gate protecting this crossing. The locomotive then shoved the cars across the Rock Island crossing and on to the brewery track for a distance of approximately 1,000 feet, where at 10:44 a. m., 14 cars were cut off, crossing at grade an industrial track of the M. K. & T. Railroad and Walnut Avenue. The total distance of the movement was approximately 5,800 feet. No cars were picked up or set out en route. The speed at no time exceeded 8 miles per hour. Movements on the M. K. & T. industrial track are light.

4. The locomotive and all of the cars were equipped with power brakes, but the air hose between the locomotive and adjoining car was disconnected, and this prevented the engineer of the locomotive drawing the cars from using and operating the brakes on such cars during the movement.

5. The locomotive then pulled out of the brewery track with the 5 remaining cars attached and shoved into the Santa Fe interchange track.

6. The Frisco and Rock Island main lines are used by passenger trains, through freight trains, and numerous transfer movements. Traffic, including loaded school buses, is moderately heavy on Sante Fe Avenue but is light on Walnut Avenue.

7. Protection at the crossing of the Rock Island main line tracks consists of a board with the word "Stop" and a light with a red lens, located at a point approximately 300 feet south of the crossing, and a manually operated gate located at the crossing consisting of a pipe framework with a stop sign mounted thereon and attached to a mast approximately 20 feet high, on the top of which are two oil lights similar to switch stand lights, the indications of which are normally yellow for movements on the Rock Island and normally red against movements on the Frisco. Said lights on the top of the mast at the Rock Island crossing, which are maintained by the Rock Island, were not connected with any signal system on the Rock Island. No protection is afforded for the crossing with the M. K. & T. industrial track.

8. At Santa Fe Avenue, a graveled street which was crossed by the locomotive and some of the cars, protection consists of a standard crossbuck sign. At Walnut Avenue and the private crossing above referred to, there were no standard railroad crossing signs. Santa Fe Avenue and Walnut Avenue were the only two public crossings involved.

9. The grade on the main line is practically level. From the connection of the freight house lead to the main line northeastward, the grade descends approximately 1% for a distance of 430 feet, as near as the eye can tell. From a point 300 feet south of the Rock Island crossing to the Rock Island crossing, the grade is 1% ascending or approximately so. From the Rock Island crossing northwestward for approximately 400 feet, the grade is descending.

10. That G. W. Beckley would testify that he has been Claim Agent for the defendant company at Oklahoma City for the past 37 years, and that to his knowledge no accident or injury has occurred to any employee, or other person resulting from the type of operation involved. That such information is included in this stipulation at the request of the defendant, and the Government is without information in the matter and objects to its admission solely on the ground as to its materiality to the issues involved.

A legion of previous Courts have had to determine whether specific railroad operations were "train" movements or mere switching operations in order to rule upon the applicability of the Safety Appliance Act. Although this Court has carefully studied many of these previous decisions, no useful purpose can be served by referring individually to them. All these prior holdings emphasize that the question before the Court must be resolved in light of its own peculiar facts; no exact precedent exists.

In United States v. Panhandle & Santa Fe Ry. Co., the Court did give a resume of certain factors which have been taken into consideration by the Courts. In holding that a train movement had taken place that Court said:[3]

"In making this determination, the decisions, to some of which we have referred, usually consider, among other matters, the similarity of the movement in question to the usual line haul, the distance involved, the possibility of contact or hazard with other trains, and the evidenced statutory intention to attain safety of operation for other trains and railroad employees. * * * Possibility of injury to vehicular traffic and pedestrians upon street grade crossings has been also weighed in determining whether the statute has been violated, but the validity of this feature as a controlling element is subject to question, especially unless it be borne in mind that absence of street crossings upon the route of a movement of locomotive and cars is only evidentiary upon the case as a whole and does not alone change a train movement to a switching operation. * * *"

The Court believes that under the stipulated facts the operation in the instant case constituted a "train" movement as distinguished from a mere switching operation. Nineteen cars were involved in the transfer; the locomotive moved a distance of some 3,000 feet over the *main* line before stopping; at the time of such stopping some of the cars blocked Santa Fe Avenue, on which public thoroughfare the traffic, which includes loaded school buses, is moderately heavy; the locomotive then shoved the cars in a reverse movement off the main line onto the freight house lead track, moved approximately 1,800 feet and crossed a private crossing at grade; the locomotive then shoved the cars across the Rock Island crossing and onto the brewery track a distance of about 1,000 feet, where 14 cars were cut off, and crossed at grade, an industrial track of the M. K. & T. Railroad and Walnut Avenue, a lightly traveled public thoroughfare. The Frisco and Rock Island main lines are used by passenger trains, through freight trains, and by numerous transfer movements.

In United States v. South Buffalo R. Co., Judge Augustus N. Hand said.[4]

"It is true that the decisions we have relied upon involved not only the transfer of cars as a single unit but also certain accompanying hazards on the route, which were somewhat different from and perhaps greater than those in the case at bar. We can see no essential difference however between a public crossing and the private way in the present case; indeed, a public crossing might have less traffic than the private one which intersected defendant's line. *If the crossing here had been that of another railroad or of a public thoroughfare, we believe that under the authorities the defendant would not be exempt from the Safety Appliance Act.* Nor is it reasonable to say that the existence of more than one crossing is necessary in order to create sufficient hazards to render the Act applicable. We think it undesirable for the courts by their decisions to enable railroads to eliminate safety appliances where hazards undoubtedly exist to

---

3. 5 Cir., 1953, 203 F.2d 241, 246. In such case the Court refused to put its sanction upon the argument made by the railroad company that a "switching" movement was involved because, "first, they were all made within a single yard, and, second, they were each only an incidental and component part of a day's switching work by a switching crew." 203 F.2d 241, 245.

4. 2 Cir., 1948, 168 F.2d 948, 952. In such case the operation being considered had to do with 15 cars which had been gathered together by various switching movements and were then transported as a unit at an average speed of five miles per hour for a distance of approximately two miles to points where they were then broken up and switched to different tracks for further shipment or unloading. Through trains did not pass over the tracks in question. However, there was testimony by a safety inspector for the Interstate Commerce Commission that there was grave danger in moving these cars over the grades involved without having the air brakes hooked up.

some substantial degree and where the use of such appliance would insure increased protection. * * *" (Emphasis supplied.)

█ This Court believes that in the movement in question "hazards undoubtedly exist to some substantial degree and * * the use of such appliance would insure increased protection". Also, as said by Mr. Justice Clarke in Louisville & Jeffersonville Bridge Co. v. United States:[5]

"The work done with the cars, as described, was not a sorting, or selecting, or classifying of them, involving coupling and uncoupling and the movement of one or a few at a time for short distances, but was a transfer of the 26 cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot, therefore with propriety be called a switching movement."

The Court has read the cases of United States v. Chicago, B. & Q. R. Co.[6] and United States v. Elgin, J. & E. Ry. Co.,[7]

relied upon by the defendant. However, the Court considers these two cases distinguishable from the instant case. In the Chicago B. & Q. R. Co. case, supra, the movement was over a lead track located within a single railroad switching yard; this lead track was not used for the movement of through freight or passenger trains. In the Elgin, J. & E. Ry. Co. case, supra, the movements all took place within the terminal yard; no public highways nor tracks of other railroads were within the area; and, the tracks over which the contested movements were made were not intersected at grade by any street, highway or public crossing. However, insofar as either of these cases may conflict with the rationale of Judge Hand in the South Buffalo R. Co. case, supra, this Court chooses to follow the South Buffalo R. Co. opinion.

Plaintiff is entitled to judgment of $100 on each of its three causes of action.

An appropriate journal entry should be submitted to the Court by counsel within ten days.

---

5. 1919, 249 U.S. 534, 538, 39 S.Ct. 355, 356, 63 L.Ed. 757. Here the railroad transferred 26 cars as a unit, for delivery from the terminal of one company to that of another, without uncoupling or switching out any car, by a movement through a distance of over three-quarters of a mile, 2600 feet of it, with two startings and stoppings, on main tracks at speed reaching fifteen miles per hour, and involving crossings at grade of several city streets.

An observation made by Mr. Justice Clarke is peculiarly applicable to the factual situation in the case at bar. "It is argued that coupling of the train brakes was not necessary for the reason that the street crossings used were protected by gates, that a yard master from an elevated tower watched over the main line movements, and that the coupling of the train-brake appliances would involve more danger to the employes than the movement of the cars without their being used and operated. These suggestions serve to emphasize the dangerous character of the movement.

*But the construction which the act should receive is not to be found in balancing the dangers which would result from obeying the law with those which would result from violating it, nor in considering what other precautions will equal, in the promotion of safety, those prescribed by the act. Such considerations were for congress when enacting the law, and it has repeatedly been held by this court that other provisions of the Safety Appliance Act impose upon the carrier the absolute duty of compliance in cases to which they apply, and that failure to comply will not be excused by carefulness to avoid the danger which the appliances prescribed were intended to guard against, nor by the adoption of what might be considered equivalents of the requirements of the act. [Citing cases.]"* (Emphasis supplied.) 249 U.S. 534, 539, 39 S.Ct. 355, 357.

6. 7 Cir., 1952, 199 F.2d 223. (Appeal Pending.)

7. 7 Cir., 1950, 182 F.2d 1.