A summary of the Court's opinion and findings are, therefore, as follows:

The assignment of January 31, 1947 to defendant, Clifford W. L. Callwood, is void.

The oral assignment of defendant Else Callwood is void and of no effect, but her claim for waste is justified, and the sum of $2,500 is estimated by the Court as a reasonable allowance therefor.

Defendant Iza Callwood gets no part of the fund directly but only in so far as she is the sole heir and beneficiary of the Estate of Peiffer.

Defendant estate of Peiffer is entitled to recover the balance of the fund after the above payments have been made plus such attorneys fees and costs as are allowed against the fund.

The court will hear the attorneys on the matter of what attorneys fees should be allowed, and then Order may be drawn in accordance with this Opinion.

**UNITED STATES**

v.

**NORTHERN PAC. RY. CO.**

**Civ. A. No. 4569.**

United States District Court
D. Minnesota, Fourth Division.
April 19, 1954.

George E. MacKinnon, U. S. Atty., and Harold C. Evarts, Asst. U. S. Atty., St. Paul, Minn., and James O. Tolbert, Sp. Asst. to the U. S. Atty., Washington, D. C., for plaintiff.

M. L. Countryman, Jr., Earl F. Requa and Frank S. Farrell, St. Paul, Minn., for defendant.

JOYCE, District Judge.

This is an action seeking a penalty for alleged violation of the Safety Appliance Acts, 45 U.S.C.A. § 1 through § 16, as modified by the order of the Interstate Commerce Commission issued pursuant thereto dated June 6, 1910, 49 C.F. R. 132.1, by reason of defendant's operation of a cut or string of 40 cars within its "Northtown Yard" in Minneapolis on April 17, 1953, without cutting in the air on at least 85 per cent of such cars so as to render their brakes operative by the locomotive engineer as prescribed by the Act and Order in the case of the operation of any "train".

The facts with reference to the movement of cars and the conditions and circumstances surrounding the movement are not seriously controverted here and the question basic to decision is whether such movement constituted the operation of a train and subject to the requirement indicated or was, as defendant contends, exempt therefrom as a switching operation.

Defendant, which concedes that it was and is a common carrier engaged in interstate commerce by railroad in Minnesota, maintains and operates one of its major terminals at Minneapolis. One of its important facilities at this terminal is its "Northtown Yard" situated on the northerly boundary of Minneapolis, the greater portion being located north and outside of the limits of the city. The tracks within the yard run generally north and south and the yard is subdivided from north to south into areas designated as "A", "B" and "D" yards or areas, each area containing a number of parallel rows of short stretches of track. These tracks in each area are inter-connected by a diagonal track which also serves as a lead or running track affording connection with the adjoining area. Such lead or running track connecting "A" and "B" areas crosses a public road, 43rd Avenue Northeast, at grade. Certain repair facilities of the defendant including a roundhouse are located to the east and adjacent to "B" and "D" areas and inter-connected with those areas by switching leads.

Although divided as indicated, the entire yard functions and operates as a unit, the whole being under the direction and control of one Assistant General Yardmaster and his various assistants. No passenger trains or cars are operated over the tracks in the yard, but in the course of usual operations freight trains arriving from points north and west of

Minneapolis are received and broken up in the "A" area, and the cars classified for further disposition depending upon their intended destination. In the same manner through westbound freight trains are assembled in and depart from the yard. Trains arriving from and departing for other stations on defendant's line are operated in accordance with the air-brake requirements involved here. Other sorting, classification and intermediate movements within the yard are performed by yard or switching crews paid at rates established for switching or yard work. Such movements are performed under the supervision of the yardmaster and no time tables or train orders are used. No block or running signals are used in the yard but all movements are apparently conducted under the restricted speed rule established by defendant which provides, "Proceed prepared to stop short of train, obstruction, or anything that may require the speed of a train to be reduced."

Prior to the movement in question, 40 cars had been assembled on track No. 8 in the "D" area. A diesel-powered locomotive was coupled to these cars and the air cut in on the first ten cars only. The locomotive then drew this cut of cars, as a unit, out of "D" area and along the running track through the "B"' area and over the 43rd Avenue crossing. The movement was halted on the crossing to permit members of the crew to line a switch and then proceeded into the "A" area. When the last car entered "A" area the last ten cars were detached and left standing and the engine and remaining cars pulled farther along the same track where the locomotive was detached. Thereafter the same engine proceeded to classify the cars first detached. The entire movement covered a distance of approximately 2.3 miles and was made in accordance with the local yard rules at a speed not greater than five miles per hour and not in excess of three miles per hour during the approach to the switching lead to the roundhouse and again upon approaching the 43rd Avenue crossing. The entire movement was continu-ous and no cars were set out or added until as indicated the cut of cars was divided after it reached the "A" area. The movement was conducted by a locomotive and crew which were ordinarily engaged in switching work and so classified and paid. The locomotive and cars operated without the markers prescribed for train operations by the defendant's operating rules and no caboose was attached. The cutting in of air on 25 per cent of the cars in the present movement was done in accordance with the practice of the defendant adopted in April 1953 with respect to this and similar movements.

The Act nowhere defines the term "train" and accordingly it is necessary to look to the case law for assistance in determining its meaning. In United States v. Northern Pac. Ry. Co., 254 U.S. 251, 254, 41 S.Ct. 101, 102, 65 L.Ed. 249, the Supreme Court defined it by exclusion in the following language:

"A moving locomotive with cars attached is without the provision of the Act only when it is not a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains."

In this connection it is apparent that the tests to be applied require a consideration of the essential facts of the case without reference to such matters as the particular nomenclature employed by defendant or the other and general duties of the persons it employed to accomplish the movement. United States v. Chicago, B. & Q. R. R., 237 U.S. 410, 413, 35 S.Ct. 634, 636, 59 L.Ed. 1023.

"* * * the controlling test of the statute's application lies in the essential nature of the work done rather than in the names applied to those engaged in it."

Where, as here, the particular movement of cars partakes of the nature both of a train and of a classification movement abstract definition is of little help. It is obvious from an examination of the cases that the courts have taken notice of the

remedial nature of the Act and in view of its purpose to promote the safety of employees, travelers upon the road and the public at large, see Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757; United States v. Northern Pac. Ry. Co., D.C. Minn., 72 F.Supp. 528, have considered the dangers inherent in the movement under consideration in determining its proper classification as a train or otherwise. However, the steps taken by the carrier to meet such danger cannot serve as a substitute for the mandatory statutory requirements. Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355. It is immaterial in such case that alternative safety measures adopted by the railroad would in the court's judgment be equally efficacious.

The defendant urges that many factors found in other cases are absent here, and this it contends demonstrates the present movement was not that of a train within the meaning of the statute. However, such individual considerations whose presence in a factual situation may be important with others in a determination that a movement of cars is a train, are not considered essential and their absence not determinative that a particular movement is not a train. Accordingly, among other things, it is not conclusive that the movement did not traverse main line track. United States v. Northern Pac. Ry. Co., 254 U.S. 251, 41 S.Ct. 101. Nor that the movement was restricted to the confines of a single yard. United States v. Southern Pac. Co., 9 Cir., 100 F.2d 984; Illinois Cent. R. Co. v. United States, 8 Cir., 14 F.2d 747; United States v. Panhandle & S. F. Ry. Co., 5 Cir., 203 F.2d 241. Nor that the movement did not run upon fixed schedule, United States v. Northern Pac. Ry. Co., 254 U.S. 251, 41 S.Ct. 101, and carried no caboose or markers. United States v. Chicago B. & Q. Ry. Co., 237 U.S. 410, 35 S.Ct. 634. Of course these facts are of evidentiary significance in assessing the nature of the operation. See United

States v. Texas & New Orleans Ry. Co., D.C.S.D.Tex., 13 F.2d 429.

It is clear that the assemblage of locomotives and forty cars, when put in motion, is sufficient to satisfy the dictionary definition of a train, as well as the requirements of the ordinary meaning of the term. Louisville & Jeffersonville Bridge Co. v. United States, 249 U. S. 534, 39 S.Ct. 355. Accordingly the question is whether in its proper setting the essential nature of the work done by the movement was that of train transportation or merely of switching or classification of cars. United States v. Panhandle & S. F. Ry. Co., 5 Cir., 203 F.2d 241.

The language of some of the cases might indicate the statutory requirement is not applicable to any operation within a railroad yard having to do with breaking up or assembling trains for road runs. In United States v. Erie R. R., 237 U.S. 402, 407, 35 S.Ct. 621, 624, 59 L.Ed. 1019, the court stated:

> "When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains, and whereby incoming trains which have completed their run are broken up. These are not train movements, but mere switching operations, and so are not within the air-brake provision."

However, it should be noticed that the above reference to switching relates to "cars" and the above statement was prefaced by the following observation:

> "It will be perceived that the air-brake provision deals with running a train, while the other requirements relate to hauling or using a car."

And in Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 538, 39 S.Ct. 355, 356, the court stated:

> "The work done with the cars, as described, was not a sorting, or se-

lecting, or classifying of them, *involving a coupling or uncoupling, and the movement of one or a few at a time for short distances*, but was a transfer of the 26 cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot therefore with propriety be called a switching movement." (Emphasis supplied.)

Of course the Supreme Court has not attempted to lay down any conclusive test as to the scope to be accorded to switching operations and there appears to be a diversity among the circuits with reference to that matter as well as the question of the amount of consideration to be afforded to the dangers or lack of them implicit in the particular movement. The difference appears to be one of emphasis. The cases in the seventh circuit, of which United States v. Elgin, J. & E. Ry. Co., 182 F.2d 1, and United States v. Chicago B. & Q. R. Co., 7 Cir., 199 F.2d 223, are representative, appear to support the postition of the defendant here but do not appear to be reconcilable with those of the second circuit, United States v. South Buffalo R. Co., 168 F.2d 948, the ninth circuit, United States v. Southern Pac. Co., 60 F.2d 864; United States v. Southern Pac. Co., 100 F.2d 984, nor of this circuit, see Illinois Cent. R. Co. v. United States, 8 Cir., 14 F.2d 747.

▮ It does not appear that this court should consider operations prior or subsequent to the movement in question and remotely connected therewith for the purpose of including them with the movement proper and categorizing the whole as switching or classification work, even if the present evidence were sufficient to permit a finding or inference of the connection of such other operations and their character as switching movements. As indicated in United States v. Panhandle & S. F. Ry. Co., 5 Cir., 203 F.2d 241, 246:

"The consideration which . the courts should give to 'the essential nature of the work being done' is the nature of the work being done in transporting the movement in question,—the essential nature of the work done by the engine and crew at the time of such transportation."

An examination of the same cases indicates a varying approach to the weight properly given to the apparent dangers of the operation in attempting to discover whether the movement was of the type intended to be covered by the Act. Most of the cases in which a violation was found did involve, as indicated in United States v. South Buffalo R. Co., supra, not only the transfer of cars as a single unit but also certain accompanying hazards on the route, which in the language of that case, "were somewhat different from and perhaps greater than those in the case at bar." The principal danger apparent in the present case is found in the crossing of the public street at grade although there is also indication of possible danger and interference in passing the switch leads to the roundhouse. Although the case last mentioned involved only one crossing, that of a private way, there was evidence there that the absence of air brakes rendered the crossing dangerous. However, it is interesting to note the court's comment at page 952 of 168 F.2d of the opinion:

"If the crossing here had been that of another railroad or of a public thoroughfare, we believe that under the authorities the defendant would not be exempt from the Safety Appliance Act. Nor is it reasonable to say that the existence of more than one crossing is necessary in order to create sufficient hazards to render the Act applicable."

Nor does it appear that the court attempted in United States v. Northern Pac. Ry. Co., D.C.Minn., 72 F.Supp. 528, a case similar to that at bar, to weigh or assess the danger of the movement there involved as it was affected by the amount of traffic upon the public streets crossed except to determine the existence of some danger against which precaution was necessary. As there pointed

out, it is not for the court to determine whether the care adopted by the defendant in conducting the movement is equivalent in safety to that which would exist if the Act had been complied with. Evidence was offered in the present case to the effect that at the speeds used and with air connected in 25 per cent of the cars the stopping distance was not appreciably different than if the air on 85 per cent of the cars had been connected. This, however, is an attempt to demonstrate the relative safety of the alternative measures adopted by defendant and does not demonstrate a lack of danger inherent in the movement if made only with the hand brakes on each car, which would be the measure of compliance with applicable provisions if the movement were merely a switching or classification of cars.

Having in mind the remedial character of the Act, it appears that this movement of 40 cars for a distance of 2.3 miles without setting out or adding a single car, and which crossed over a public street at grade, cannot properly be considered a mere switching operation. It follows that paintiff is entitled to judgment.

It appears that here as in United States v. Southern Pac. Co., 9 Cir., 60 F.2d 864, the defendant has made equivalent transfer movements for many years without criticism from the inspecting officers. It does not appear that such mere non-enforcement by the agents of the Interstate Commerce Commission, even if knowingly indulged in, could be considered to be acquiescence on the part of the Commission itself. There is no regulation, order or construction on the part of the Commission shown here which would occasion its consideration by this court as was the case in United States v. Chicago, St. P., M. & O. R. Co., 8 Cir., 43 F.2d 300, 71 A.L.R. 507.

Similarly, the court is not unaware that the application of the air brake requirements to movements such as this will create substantial difficulties for defendant. As indicated, however, this court is not authorized to make its determination dependent upon its own evaluation of such difficulties of operation or of the dangers of defendant's present methods as compared with those required by the law.

Plaintiff may prepare and submit proposed findings of fact, conclusions of law and order for judgment. An exception is reserved to the defendant.